# THE EDWIN I. MORRISON.[1]

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 227.   Argued January 24, 1894. — Decided April 30, 1894.

When it is agreed by a charter party, on the part of the vessel, that she shall be tight, staunch, strong, and in every way fitted for the voyage, the owner is bound to see that the vessel is seaworthy and suitable for the service on which she is to be employed, and he is not excused by the fact that a defect is latent and unknown to him; but no obligation in that respect rests upon the owner of the cargo.

In a suit in admiralty, where the libellant sought to recover for injuries to a cargo caused by the vessel taking in water through a hole in her side, made by the breaking away of the cap from one of the bilge-pump holes, and where the defence was that such breaking was caused by a danger of the sea within the exception in the charter party and bills of lading, the court below, after finding that such bilge-pumps were not unusual, and describing them and the dangers to be apprehended from them, and after finding that before sailing the cap and plate showed no indications of looseness, in an examination which, after detailing it, was found to be such as a reasonably prudent master might be expected to give, and after finding the condition of the hole at the end of the voyage, found further that "at the time of the contract and lading of cargo and commencement of voyage the vessel was tight, staunch, and strong, and in every way fitted for the contemplated voyage;" that "there was no latent defect in the vessel which contributed to the injury to the cargo;" and that "the whole of said damage to cargo was caused by a danger of the sea, and was within the exception in charter party and bills of lading." *Held,*

(1) That these were findings determined by the interpretation which the law put upon the circumstances of the transaction as stated in the previous findings, and, as such, open to revision here;

(2) That these deductions were incorrect, and the specific conclusions of law did not follow.

THIS was a libel filed by the Bradley Fertilizer Company in the District Court of the United States for the Southern District of New York against the schooner Edwin I. Morrison,

---

[1] The docket title of this case is " The Bradley Fertilizer Company, Appellant, *v.* The Schooner Edwin I. Morrison, her tackle, etc. — Stephen S. Lavender *et al.*, claimants."

to recover for the damage done to a cargo of guano by sea water taken aboard on January 10, 1884, on her voyage from Weymouth, Massachusetts, to Savannah, Georgia. The libel set up the charter, the loading, the bills of lading, the sailing from Weymouth, the arrival at Savannah, and the delivery of the cargo in a damaged condition; and also alleged that the schooner, when she left Weymouth and before, "was not tight, staunch, strong, and every way fitted for said voyage as agreed;" "and that the cap was gone from off the bilge-pump hole on the port side of said schooner, or was then so loosely, insecurely and negligently fastened and screwed that the same worked and came off without any danger of the sea intervening, whereby said vessel was unseaworthy and unfit for said voyage, or after leaving port said cap was removed and not properly and securely replaced and screwed down, or was negligently and improperly loosened and left insecure by those in charge of said schooner, so that by the unseaworthiness of said schooner or by the negligence and improper navigation of those in charge of her, said cap came off from said pump-hole without any danger of the sea," and that about seven feet of water was admitted through it into the hold and upon the cargo.

The answer admitted the charter, shipment, bills of lading, sailing, arrival, and delivery of the cargo in a damaged condition, and in excuse thereof alleged: "That on said voyage the said vessel encountered very rough and tempestuous weather, in consequence of which she shipped large quantities of water, and was greatly damaged by the seas, and it was found on the arrival of the said vessel at Savannah that her said cargo or a portion thereof was damaged by the said perils of the seas encountered on the said voyage, or from causes excepted in the said contract or contracts of affreightment."

The District Court found that nine-tenths of the damage to the cargo was occasioned by sea water taken in through the bilge-pump hole on the port side, and that the vessel was not seaworthy in respect of the proper security of this port cap and plate, and rendered a decree in favor of libellant. The opinion is reported in 27 Fed. Rep. 136.

Statement of the Case.

The schooner sailed on the 5th of January, and, according to the log, on the afternoon of January 9 met a very strong gale and heavy seas, and shipped great quantities of water. The log of January 10 read as follows :

" This day begins with a strong westerly gale and sea still running very high. At 8 A.M., set two-reefed foresail; set storm-trysail *and hove vessel to, heading about south ;* find that the vessel is making water faster than we can pump it out with both pumps, *the men not being able to work at pumping steadily because of heavy seas sweeping her decks.*

" (NOTE.— The words in italics are inserted on margin of log in lead pencil.)

" Sounded pumps and find that she has 7 ft. of water in the hold.

" (NOTE. — The figure 7 is written over an erasure.)

" Cut the boat lashings and got all ready to leave the vessel, when found that the cap had washed off the bilge-pump hole on the port side; nailed a piece of sheet lead over it and started both pumps agoing; pumped two hours and sound again and find that we are freeing her very rapidly. So ends this day. No latitude; no longitude."

The bilge-pump hole referred to in the above extract was a hole in the port side in the waterway, a short distance only in front of the poop, and ran down through the waterway between the ceiling and the skin of the ship. It was from three to four inches in diameter, and covered by a brass plate about four inches square, countersunk into the timber, through which was a hole, covered by a brass cap, which screwed into the plate, and the plate was fastened into the waterway by screws. There was a similar hole on the starboard side. The District Judge was of opinion that these holes, which had never been used, were dangerous unless the caps and plates to cover them were kept perfectly tight and secure ; that " the obligation to keep watch of their condition was as stringent as the danger from weakness in them was extreme ; " and that there was no satisfactory evidence that there had been more than a casual examination of them since the schooner was built, some eleven years previous.

The theory of the defence was that the plate and cap were perfectly tight, but that, through the many seas taken aboard, they were knocked off by accident or by some blow from floating articles. The District Judge held that this was possible, but for reasons, which he gave, that its probability was exceedingly small; and that even if it could be supposed that the plate had been knocked off through the blow of some object washed across the deck, it would still be incumbent on the claimant to show that the cap and plate were so made and fastened as not to be knocked off by ordinary collisions of that kind, which had not been done; that while there could be scarcely any doubt that the cap and plate were carried off through the action of the sea, yet that the evidence indicated clearly that this was done before the vessel was subjected to any extraordinary conditions, aside from her deep loading, and that there was no indication of any such violence about the wood work in that quarter as would be necessary to knock away such a cap if properly secured; and that the only reasonable conclusion was that after eleven years' service the fastenings had become weak, and that the plate had been carried away from that cause, and not from any extraordinary contingencies.

The case having been taken to the Circuit Court, the testimony of one Candage, an expert, was given to the effect that these bilge-pump plates in the waterways were regarded as permanent fixtures not requiring to be removed for examination; that by taking hold of the cap one could judge of the firmness of the plate; that he had sometimes unscrewed the cap, but usually could judge of condition by the eye; that by unscrewing one could judge of the condition of the wood slightly better; that he never thought it necessary to unscrew the plate, which, if done frequently, would have a tendency to weaken the fastenings; that if the plate of the Morrison had been there for ten or eleven years and never removed, and had been painted over from time to time with the ways, no examination was necessary other than by the eye; that he would say as matter of opinion there would be no gradual weakening of the fastenings of the plate; that upon the de-

Statement of the Case.

tails stated in a hypothetical question it was his opinion that the loss of the bilge-pump plate was attributable to the fact that some hard substance had been dashed against it by the force of the waves and the rolling of the vessel, though the force of the water alone could not have ripped it out and carried it away. The Circuit Judge was of opinion (40 Fed. Rep. 501) that "the vessel was not originally unseaworthy because she had bilge-pump holes covered as these were. The presumption of continuing seaworthiness in respect to this part of the ship is not rebutted by the single fact that no special test was made as to their condition, in view of the testimony (especially that taken in this court) as to what is the usual examination given to such structures." And he concluded that the inference to be drawn from the testimony was "that there was no defect, patent, or latent; that the fastenings were sufficient, and were knocked out by a blow such as could not reasonably have been anticipated, and which was caused by a danger of the sea."

The Circuit Court made its findings of fact and conclusions of law, which are given in the margin,[1] (and to which, in

[1] "I. The schooner Edwin I. Morrison, owned by the claimants, was chartered on December 19, 1883, by a written charter party, to the libellant for a voyage from Weymouth, Mass., to Savannah, Ga., to carry a complete cargo of guano in bags and (or) bulk for a price agreed upon.

"II. By the charter party it was agreed on the part of the vessel that she 'should be tight, staunch, strong, and every way fitted for such a voyage,' and 'the dangers of the sea (were) mutually excepted.'

"III. Under this charter there was loaded on board said schooner by the libellant a cargo of guano, superphosphate, and other fertilizers, viz., $343\frac{1680}{2240}$ tons in bulk and $410\frac{45}{61}$ tons in bags, besides 3925 empty bags and sacks. Six bills of lading were given therefor, which acknowledged the receipt of said cargo in good order and condition and agreed to deliver the same in like good order and condition at Savannah, the dangers of the sea only excepted. The bulk cargo was stowed between decks and the remainder in the lower hold.

"IV. The cargo was what is known as a 'dead cargo,' and a hard one for a vessel to carry in severe weather.

"V. The vessel was not overloaded. She was accustomed to and able to carry that amount of cargo of the same character at that season.

"VI. The vessel was built in 1873; had three masts; was about 155 feet long over all, carrying spanker, mainsail, foresail, forestaysail, jib, flying

whole or in part, and to certain refusals to find, libellant filed twenty-seven exceptions,) and rendered a decree reversing the

---

jib, outer jib, fore-topsáil, main-topsail, and mizzen-topsail. She was properly manned and equipped. Her officers and crew consisted of a master, first mate, second mate, steward, and four sailors. On this voyage she had two passengers on board, viz., the master's wife and a lady friend.

"VII. On the port side of the vessel, in the waterway, and close to the bulwark, there was a hole about three inches in diameter, made when she was built, for the purpose of introducing a hose-pipe into her bilges to free her of any water accumulated there. The waterway (of yellow pine) was about three and a half inches above the deck. The hole was a short distance in front of the poop and ran down through the waterway, between the ceiling and the skin of the ship. The hole was covered by a brass plate about four inches square, countersunk into the timber flush with the top of the waterway and fastened by four brass screws. In the brass plate was a removable cap, also of brass, intended to be unscrewed from the plate when the hole was to be used, but it had not, in fact, been used for four or five years (if, indeed, at all) and was painted over whenever the waterway was painted. The removable cap projected about three-eighths of an inch above the surface of the plate, the edges being bevelled so as to leave not more than an eighth of an inch of perpendicular surface. There was a similar plate and cap on the starboard side of the vessel, but somewhat further aft and upon the poop deck.

"VIII. Such bilge-pump holes are not unusual in vessels constructed in some localities. The plates are generally considered permanent fixtures, not peculiarly susceptible to deterioration from age. Verdigris sometimes forms around brass screws, thus weakening the hold of the wood; but waterways located as this was, well covered up and well painted, are not liable to rot, and their reasonable expectation of sound life is largely in excess of twelve years.

"If the plates and caps which are generally used to cover such holes are not kept tight and secure, the holes become dangerous; but that mode of covering was generally deemed secure by seafaring men, and seldom, if ever, have any accidents arisen from their use.

"IX. The bilge-pump hole, heretofore described as located in the waterway, was opposite a port in the bulwarks of the vessel. The opening of the port was about a foot square, beginning about two inches from the bulkhead of the poop deck. The poop deck was about four and a half feet above the main deck, and extended from just about the mainmast to the stern.

"X. Said bilge-pump plate was in plain view, upon a casual inspection, at the time of making the charter and loading the vessel. The vessel was loaded several times before this voyage by the libellant.

"XI. Before the vessel sailed the cap and plate appeared to be in good order, with no indication of looseness. The examination which was at that

decree of the District Court, and dismissing the libel with costs, whereupon the cause was brought by appeal to this court.

---

time made of them consisted of such inspection as could be given by the eye, and to such an inspection they were from time to time subjected. They were not tested either by unscrewing the cap or the plate, or by tapping the plate with a hammer. Tapping with a hammer or unscrewing the cap might have developed any insecurity (if there were any) in the bilge-pump plate. Immediately after the loss of the port-bilge plate (hereafter described) the mate tested the condition of the similar plate on the poop deck, starboard side, by tapping with a hammer, and found it apparently sound.

"XII. The examination which was made of the cap and plate, as set forth in the XIth finding (viz., by a survey without the use of special tests, unless there is some appearance of defect,) is such as a reasonably prudent master or owner might be expected to give them in order to determine the seaworthiness of his vessel before beginning a voyage.

"XIII. The voyage began the 5th day of January, 1884, and the vessel actually got to sea on the 7th, when she encountered a strong northwest gale. The light sails were furled and the mainsail and foresail double-reefed. The gale caused her to labor heavily and ship large quantities of water, some of which entered the cabin and reached the cargo. The vessel was driven out of her course and into the Gulf Stream. The gale moderated somewhat the latter part of the day, but the vessel still continued to roll heavily and shipped plenty of water. The pumps were attended to and the vessel was found to be making considerable water. The next day the gale continued, with a very heavy sea running, until about 4 P.M., when it moderated, and at 6 P.M. topsails were set. The latter part of the day there was a strong breeze, and two reefs were made in the spanker. The vessel made little water this day. The next day, the 9th, began with a strong southeast breeze, which freshened to a strong gale. Two reefs were made in main and foresails. At 4 P.M. the spanker and jib were furled. The middle part of the day there was a very sharp gale and heavy sea running. The vessel labored heavily and shipped great quantities of water. The pumps were carefully attended to, and she was found to be making considerable water. The latter part of the day the wind was still increasing and the foresail and the fore staysail were furled. It was then blowing a 'living' gale from the westward. The weather through the night continued to be extremely severe; there was a 'terrific gale of wind.' Planks were carried away from the bulwarks of the starboard side of vessel, also one of the ports; the waterway on starboard side was started off. The covers of the chain locker and a spar were found loose in the morning, floating in the waist of the vessel on both sides. Coal washed about decks; also buckets and bucket racks; also pieces of bulwark. The forecastle door and galley door were washed off, but were not lost. The men could not stand at pumps on main deck because it was continually swept by the seas, and it was with

*Mr. George A. Black* for appellant.

*Mr. George Bethune Adams* for appellee.

difficulty that they were able to work at the pump on the poop deck, which was about four and a half feet higher than the main deck, on account of the sea breaking over. Before midnight the vessel was hove to under a storm trysail, two-reefed foresail, and fore staysail on the port tack. The vessel was shipping water through the cabin windows, doors, and down the booby hatch. The cabin was situated in the after part of the poop deck. The top of the cabin house was about three and a half feet above the deck. They commenced to take water in the cabin while eating supper, and all through the night it forced its way in. This was unusual and indicated very bad weather and a rough sea. Everything in the cabin was drenched, excepting the berths, with water washing around the cabin with motion of vessel. Water reached the cargo during the night through the cabin, a strained waterway, and otherwise. The pumps were tried every two hours, and by four o'clock Thursday morning it was discovered, by the pumps bringing up guano with the water, that the cargo was wet. The master of the vessel did not go to bed during the night, but was mostly on deck. Previous to 4.30 o'clock in the morning they were able to get a suck on the pumps, indicating that there was no water then in the well, but after that they were unable to do so. At this time the weather was very bad, a very bad sea flooding the decks continually and washing everything movable about. About five o'clock they sounded and found eighteen inches of water in the well. In about half an hour afterwards they wore ship, putting the vessel before the wind, so that the men could stand at the pumps. This gave the vessel a list to port. The only outlets on the port side for the seas that came aboard were the open port above mentioned and the scuppers. They continued pumping, but still were unable to get a suck, and at nine o'clock soundings showed about seven feet of water in the vessel. Preparations were then made to abandon the vessel, as she was supposed to be sinking. The lashings of the boat on the poop deck were cut and the women on board came up from the cabin to take the boat. Between ten and eleven o'clock they wore ship and the vessel slowly righted up, the booms swinging from the port to the starboard side, bringing the port side out of the water. The vessel was then working heavily in the sea, losing steerage-way, and settling fast. When the vessel righted up and rolled her lee side out of water, the second mate, who with others fastened with lines to prevent them from being washed away, was working at the pump on the main deck, heard a heavy gurgling sound, and let go the pump and went over to the port side, put his hand against the rail, and looked down under it to where the bilge-pump plate was, and saw a hole large enough to put his hand in. He ran his hand and arm down the hole and sung out to the captain, 'Look here!' Being greatly excited and not looking for such a thing, he hardly realized what the trouble was. The captain came and

## I. The findings of the Circuit Court are conclusive as to the facts.

said, ' My God, this is the bilge pump!' It was found that the whole bilge-pump plate, with the screws, was gone.

" XIV. The wood to which the plate had been fastened looked white and sound. From the holes out of which the screws had come part of the clear wood was itself hauled, the splinters hanging around the edges of the holes, the holes thus presenting a ragged look. The screw-holes were not smooth nor black nor rusty. The wood of this particular waterway in the vicinity of the plate did not look rotten, and when after arrival at Savannah the temporary plugging referred to in the XVIIth finding was removed, and the hole plugged and covered with sheet lead, the timber into which the plug was driven and on which the lead was nailed was found solid, and since that time the covering had not been further repaired nor the timber changed in any way.

" XV. No marks of violence other than the splintering of the wood about the screw-holes were visible upon the waterway or upon the adjacent bulwarks or stanchions.

" XVI. As no one witnessed the removal of the bilge-pump plate, direct evidence of the cause of this mishap is not obtainable. It is, however, to be inferred from the facts proved that it was knocked out by something striking violently against it subsequently to the time when they wore ship after finding eighteen inches of water in the well, which would be between 5 A.M. and 5.30 A.M.

"XVII. The hole was at once plugged up, covered with canvas, and sheet lead nailed over the canvas.

" XVIII. At this time the wind had abated somewhat. The vessel's wheel was tied hard up and the sails trimmed so that she would lie to, and the crew went to work pumping again and gained on the water. By eleven or twelve o'clock that night they succeeded in getting her free of water, so far as the pumps could do so, and the journey was continued.

" XIX. Afterwards it was found that the mainmast had been loosened by the working of the vessel, and that the coating was broken; also that a scupper on the starboard side was broken.

" XX. The weather continued severe during almost the entire voyage and the injury to the cargo was increased thereby.

" XXI. The vessel arrived in Savannah, January 27th.

" XXII. Upon the arrival she delivered her cargo, some of it in a damaged condition. The extent of the damage was $9175.40.

" XXIII. At the time of the contract and lading of cargo and commencement of voyage the vessel was tight, staunch, and strong, and in every way fitted for the contemplated voyage.

" XXIV. There was no latent defect in the vessel which contributed to the injury to the cargo.

" XXV. There was no fault or negligence in the navigation of the vessel or care of the cargo.

The argument made by appellant in its brief is a manifest attempt to obtain in this court a review of the findings made by the Circuit Judge under the act of 1875. The whole argument is such as would be appropriate before a court of original jurisdiction on the trial of the cause, but is clearly out of place on this appeal. This court has repeatedly held that under the act of 1875, it is only ultimate facts which the Circuit Court is bound to find, that refusals to find mere incidental facts, amounting only to evidence from which the ultimate fact is to be obtained, will not be noticed; but that if the Circuit Court refuses to make a finding, one way or the other, as to a material fact established by uncontradicted evidence, or if it finds such a fact when not supported by any evidence, this court will review the rulings, provided exceptions are properly taken, and the questions are presented by bill of exceptions. *The E. A. Packer*, 140 U. S. 360; *The City of New York*, 147 U. S. 72, and cases cited.

II. The question of seaworthiness was purely one of fact. *Walsh* v. *Washington Ins. Co.*, 32 N. Y. 427.

III. The circumstances under which the plate was lost raised a presumption that it was caused by dangers of the seas.

Aside from the inferential finding of fact that the plate was knocked out by something striking violently against it, the same result would follow as a necessary conclusion from the facts which were directly testified to and found.

Bilge-pump holes covered with such plates were not unusual, and their reasonable expectation of sound life was largely in excess of the age of this vessel. This mode of covering the holes was generally deemed secure by seafaring men, and seldom, if ever, had any accidents arisen from their use. The District Judge found to the same effect.

---

"XXVI. The whole of said damage to cargo was caused by a danger of the seas, and was within the exception in charter party and bills of lading.

*" Conclusions of Law.*

"First. The damage is to be attributed to the dangers of the seas, and not to the fault of the vessel.

"Second. The decree of the District Court is reversed and the libel dismissed with costs of both courts."

Before commencing this voyage the vessel had been examined in the usual manner, and the plate seemed to be in good order. The examination made was such as a reasonably prudent master or owner might be expected to give in order to determine the seaworthiness. of his vessel. At this time she was tight, staunch, and strong, and in every way fitted for the contemplated voyage.

Almost immediately after the commencement of the voyage, she encountered a storm of unprecedented violence, from the effect of which she took in eighteen inches of water which came in contact with the cargo and soaked it to some extent directly, and by capillary attraction.

While in this condition, the port then being the weather side, she wore ship. Just before this time the weather was very bad, a bad sea was flooding the decks continually and washing everything movable about. The covers of the chain locker and a spar were found loose in the morning, coal washed about decks, also buckets, racks, pieces of bulwark, the forecastle door and the galley door. The wearing of the ship gave her a list to port, and the only outlet on that side for the seas and wreckage, excepting the scuppers, was the open port opposite which the plate was located.

After she took in 5 or 6 feet more of water, the loss of the plate was discovered, and we will assume *arguendo* that this additional water was due to its loss.

It was then found that the wood where the plate was fastened was sound, that the screws in coming out had hauled part of the clear wood, leaving splinters hanging around the edges of the holes, the holes thus presenting a ragged look. The screw holes were not smooth, black, or rusty.

Under these circumstances the authorities fully sustain the legal conclusion: " The damage is to be attributed to the dangers of the seas and not the fault the vessel." *The Rover*, 33 Fed. Rep. 515; *Lunt* v. *Boston Marine Insurance Co.*, 6 Fed. Rep. 562.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

Assuming, as we must, that the damages awarded by the District Court resulted from the loss of the cap and plate covering the bilge-pump hole, the question to be determined is whether that loss was occasioned by a peril of the sea or by the condition of that covering as it was when the vessel entered upon her voyage. If through some defect or weakness the plate and cap and the screws which secured it came off, or if the cap and plate were so made or so fastened as to be liable to be knocked off by any ordinary blows from objects washed by the sea across the decks, then the vessel was not seaworthy in that respect, and the loss could not be held to come within the exception of perils of the sea, although the vessel encountered adverse winds and heavy weather. By the charter party it was agreed on the part of the vessel that she should be tight, staunch, strong, and in every way fitted for the voyage, and the rule is well settled that the charterer is bound to see that his vessel is seaworthy and suitable for the service for which she is to be employed, while no obligation to look after the matter rests upon the owner of the cargo. *The Northern Belle,* 9 Wall. 526; *Work* v. *Leathers,* 97 U. S. 379. If there be a defect, although latent and unknown to the charterer, he is not excused. 3 Kent, *205; Valin, Com. Ord. de la Mar. liv. III, tit. III, Du Fret; art. XII, vol. 1, 654; *Lyon* v. *Mells,* 5 East, 428; *Work* v. *Leathers, supra.*

As said, on circuit, by Mr. Justice Gray, in *The Caledonia,* 43 Fed. Rep. 681, 685: "In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the ship owner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence." In *The Glenfruin,* 10 P. D. 103, 108, the same rule is thus expressed by Butt, J.: "I have always understood the result of the cases from *Lyon* v. *Mells,* 5 East, 429, to *Kopitoff* v. *Wilson,* 1 Q. B. D. 377, to be that under his implied warranty of seaworthiness, the ship

owner contracts, not merely that he will do his best to make the ship reasonably fit, but that she shall really be reasonably fit for the voyage. Had those cases left any doubt in my mind, it would have been set at rest by the observations of some of the peers in the opinions they delivered in the case of *Steel* v. *State Line Steamship Co.*, 3 App. Cas. 72."

. Perils of the sea were excepted by the charter party, but the burden of the proof was on the respondents to show that the vessel was in good condition and suitable for the voyage at its inception, and the exception did not exonerate them from liability for loss or damage from one of those perils to which their negligence, or that of their servants, contributed. *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 438. It was for them to show affirmatively the safety of the cap and plate; and that they were carried away by extraordinary contingencies, not reasonably to have been anticipated. We do not understand from the findings that the severity of the weather encountered by the Morrison was anything more than was to be expected upon a voyage, such as this, down that coast and in the winter season, or that she was subjected to any greater danger than a vessel so heavily loaded, and with a hard cargo, might have anticipated under the circumstances. The especial peril which seemed at one time to threaten her safety was directly attributable to the water taken aboard through the uncovered bilge-pump hole, which rose from eighteen inches about 5 A.M. to seven feet at about 9 A.M., so that she was necessarily sinking deeper and deeper, while the absorption by the guano added to the dead weight, and increased the danger of her going down.

Among other exceptions, libellant excepted to the refusal to amend one of the findings by adding: " No spars nor sails were carried away and no repairs were made to the vessel at Savannah beyond nailing a few boards on the starboard side where the bulwarks had been broken, which was done by the crew; and the vessel, after discharging, loaded with a cargo of phosphate rock, which is a much harder cargo to carry than guano, and delivered it safely." These facts were established in substance by uncontradicted evidence, and as they

tended to show that the schooner was not injured to any appreciable degree, and therefore that the weather was not of such an extraordinary character as would have damaged the cargo to the extent that it was if the vessel had been seaworthy in the respect under consideration, we think the amendment was material, and should in effect have been made. What happened to the vessel after the loss of the bilge-pump plate throws but little, if any, light upon the situation at the time of the loss; and libellant excepted to parts of the thirteenth finding so far as they involved the inference that certain incidents therein detailed occurred before the cap and plate came off, as unsupported by evidence; and also to that part of the sixteenth finding which stated that it was to be inferred that the plate was knocked out "subsequently to the time when they wore ship after finding eighteen inches of water in the hold" on the same ground. But without going into these details or inquiring how far they are open to examination, the significant fact is found that although at half-past four in the morning the pumps sucked, indicating that there was then no water in the well, they did not suck (twenty minutes later, as disclosed by the evidence, nor) again until the hole was discovered and stopped up, when they gained on the water, and after several hours freed the vessel.

In any aspect, the real point in controversy is, did the respondents so far sustain the burden of proof which was upon them as to render the probability that the cap and plate were in good condition and knocked off through extraordinary contingencies so strong as to overcome the inference that they were not in condition to withstand the stress to which on such a voyage it might reasonably have been expected they would have been subjected? If the determination of this question is left in doubt, that doubt must be resolved against them.

The 8th, 11th, 12th, 14th, 15th, and 16th findings were as follows:

"VIII. Such bilge-pump holes are not unusual in vessels constructed in some localities. The plates are generally considered permanent fixtures, not peculiarly susceptible to deterioration from age. Verdigris sometimes forms around

brass screws, thus weakening the hold of the wood; but waterways located as this was, well covered up and well painted, are not liable to rot, and their reasonable expectation of sound life is largely in excess of twelve years.

"If the plates and caps which are generally used to cover such holes are not kept tight and secure, the holes become dangerous; but that mode of covering was generally deemed secure by seafaring men, and seldom, if ever, have any accidents arisen from their use.

"XI. Before the vessel sailed the cap and plate appeared to be in good order, with no indication of looseness. The examination which was at that time made of them consisted of such inspection as could be given by the eye, and to such an inspection they were from time to time subjected. They were not tested either by unscrewing the cap or the plate, or by tapping the plate with a hammer. Tapping with a hammer or unscrewing the cap might have developed any insecurity (if there were any) in the bilge-pump plate. Immediately after the loss of the port-bilge plate (hereafter described) the mate tested the condition of the similar plate on the poop deck, starboard side, by tapping with a hammer, and found it apparently sound.

"XII. The examination which was made of the cap and plate, as set forth in the XIth finding (viz., by a survey without the use of special tests, unless there is some appearance of defect) is such as a reasonably prudent master or owner might be expected to give them in order to determine the seaworthiness of his vessel before beginning a voyage.

"XIV. The wood to which the plate had been fastened looked white and sound. From the holes out of which the screws had come part of the clear wood was itself hauled, the splinters hanging around the edges of the holes, the holes thus presenting a ragged look. The screw-holes were not smooth nor black nor rusty. The wood of this particular waterway in the vicinity of the plate did not look rotten, and when after arrival at Savannah the temporary plugging referred to in the XVIIth finding was removed, and the hole plugged and covered with sheet lead, the timber into which the plug was

driven and on which the lead was nailed was found solid, and since that time the covering had not been further repaired nor the timber changed in any way.

"XV. No marks of violence other than the splintering of the wood about the screw-holes were visible upon the water-way or upon the adjacent bulwarks or stanchions.

"XVI. As no one witnessed the removal of the bilge-pump plate, direct evidence of the cause of this mishap is not obtainable. It is, however, to be inferred from the facts proved that it was knocked out by something striking violently against it subsequently to the time when they wore ship after finding eighteen inches of water in the well, which would be between 5 A.M. and 5.30 A.M."

There was no direct evidence that the plate was knocked out, or, if this were so, that it was by some extraordinary collision; and while the fourteenth finding tends to support the inference of the sixteenth, it will be observed that the tendency of the fifteenth is to rebut it. If it appeared that the wood was solid, and the screw-holes splintered, the drawing out of the screws might be imputed to a blow or blows; but, on the other hand, if there were no marks of violence in the vicinity, since such blow or blows to effect the result, if the cap, plate and waterway were in good condition, must necessarily have been of great violence, it seems almost incredible that no marks thereof appeared on the stanchions and bulwarks on the port side, and that nothing but the cap and plate were carried away. And it is proper to note that no survey of the vessel was had, and that respondents introduced no proof of exact measurements to show the height of the cap above the waterway, or of the perpendicular edge, nor was the duplicate cap on the starboard side produced.

If, however, the vessel had been so inspected as to establish her seaworthiness when she entered upon her voyage, then upon the presumption that that seaworthiness continued the conclusion reached might follow, but we are of opinion that precisely here respondents failed in their case.

From the sixth and seventh findings it appears that the vessel was built in 1873; that the bilge-pump hole had not been

used for four or five years, if at all; and that the cap and plate were painted over whenever the waterway was painted; and from the findings above quoted that these holes were dangerous unless the caps and plates were kept tight and secure; that the hold of the wood might become weakened by the formation of verdigris about the brass screws; that tapping with a hammer or unscrewing the cap might have developed any insecurity, if there were any; that no such tests were applied; but that the caps and plates appeared all right to visual observation. But this was not enough to establish the fact of security; and the twelfth finding, that examination by the eye is such as a reasonably prudent master or owner might be expected to give such coverings in order to determine their seaworthiness, does not give it that effect. The obligation rested on the owners to make such inspection as would ascertain that the caps and plates were secure. Their warranty that the vessel was seaworthy in fact "did not depend on their knowledge or ignorance, their care or negligence." The burden was upon them to show seaworthiness, and if they did not do so, they failed to sustain that burden, even though owners are in the habit of not using the precautions which would demonstrate the fact. In relying upon external appearances in place of known tests, respondents took the risk of their inability to satisfactorily prove the safety of the cap and plate if loss occurred through their displacement.

We are unwilling, by approving resort to mere conjecture as to the cause of the disappearance of this cap and plate, to relax the important and salutary rule in respect of seaworthiness. *The Reeside*, 2 Sumner, 567, 574; *Douglas* v. *Scougall*, 4 Dow, H. L. 269.

The findings that "at the time of the contract and lading of cargo and commencement of voyage the vessel was tight, staunch, and strong, and in every way fitted for the contemplated voyage;" that "there was no latent defect in the vessel which contributed to the injury to the cargo;" and that "the whole of said damage to cargo was caused by a danger of the seas, and was within the exception in charter party and bills of lading," were findings determined by the interpreta-

tion which the law put upon the circumstances of the transaction as stated in the previous findings, and, as such, open to our revision. *Sun Mutual Insurance Co.* v. *Ocean Insurance Co.*, 107 U. S. 485; *United States* v. *Pugh*, 99 U. S. 265; *The Britannia, ante,* 130; *Gilroy* v. *Price,* App. Cas. (1893) 56, 64.

In our judgment these deductions were incorrect, and the specific conclusions of law did not follow.

*The decree of the Circuit Court is reversed and the cause remanded with a direction to enter a decree for libellants for the amount found due by the District Court with interest and costs.*

MR. JUSTICE BREWER, not having heard the argument, and MR. JUSTICE WHITE, not being a member of the court when the hearing was had, took no part in the consideration and decision of the case.