## THE RAPPAHANNOCK.

(District Court, W. D. New York. September 1, 1909.)

1. SHIPPING (§ 132*)—DAMAGE TO CARGO—GROUNDS OF VESSEL'S LIABILITY—BURDEN OF PROOF.

Where cargo receives damage in transit, the carrier has the burden of showing affirmatively that the loss was within an exception of perils of the sea in the bills of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 479, 481; Dec. Dig. § 132.*]

2. SHIPPING (§ 121*)—CARRIAGE OF GOODS—CONTRACTS OF AFFREIGHTMENT.

In contracts for carriage by sea, there is an implied warranty that the vessel is in all respects seaworthy and reasonably fit to carry the particular goods specified in the bill of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 449–451; Dec. Dig. § 121.*

Implied warranty of seaworthiness, see notes to The Carib Prince, 15 C. C. A. 388; Nelson v. Coal, Cement & Supply Co., 60 C. C. A. 177.]

3. SHIPPING (§ 141*)—DAMAGE TO CARGO—LIABILITY OF VESSEL.

On a voyage from a Canadian port on Lake Superior to Buffalo, a steamer's cargo of wheat was damaged by water escaping from a feed pipe connecting the engine and boiler rooms, which was broken at a joint. The use of such feed pipe and the manner in which it was constructed and cased were not unusual on such steamers, and an inspection a month earlier, and a further examination by the officers and shipper's agent before loading, showed it to be in good condition. *Held*, that it did not render the vessel unseaworthy at the beginning of the voyage, but that under the evidence the breaking was due to perils of navigation, which strained the vessel during the voyage, and which were within the exceptions in the bill of lading; it being shown that she encountered unusually rough weather and was otherwise strained.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 498; Dec. Dig. § 141.*

Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southerland-Innes Co. v. Thynas, 64 C. C. A. 118.]

In Admiralty. Suit by the Northern Elevator Company, Limited, against the steamer Rappahannock for damage to cargo. Libel dismissed.

Wallace, Butler & Brown, Howard S. Harrington, Ulysses S. Thomas, and Archibald G. Thacher, for libelant.

Clinton & Clinton, for respondent.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

HAZEL, District Judge. The libel in this case was filed to recover damages to a cargo of grain shipped by the Northern Elevator Company, Limited, on the wooden steamer Rappahannock, owned by the respondent, the Davidson Steamship Company. There were transported by the Rappahannock, from Ft. William and Port Arthur, Ontario, Canada, to the port of Buffalo, on October 9, 1905, in the aggregate 125,000 bushels of No. 2 Northern Manitoba wheat. The shipment arrived at its destination on October 14th, and on unloading the vessel it was discovered that 11,713 bushels of the wheat were wet, moist, and heated, owing to a leak in the main feed pipe, which pipe extended about 9 feet athwartships through the cargo space between the engine and boiler rooms. This pipe was 2½ inches in diameter, was incased in a covering of asbestos, and this was inclosed in a wooden box, which was about 2 inches thick. The bills of lading provided for delivering the grain in like good order and condition as when shipped, and that if it became heated in transit the carrier was bound to pay all deficiencies, excepting 5 bushels for each 1,000 bushels, the dangers of navigation, or its equivalent term, the perils of the sea, excepted.

There is no controversy over the shipment of the wheat, its delivery in a damaged condition, or that its deterioration was due to the dripping of water through a crack in the feed pipe three-quarters of an inch long at the coupling of two lengths of the pipe. It is contended by libelant, and testimony has been introduced to establish the fact, that the locality of the pipe was improper and dangerous, that the threading of the pipe to make a joint weakened it, and that it was improperly supported and incased. Upon this contention I find, from the evidence, that it was not unusual in vessels constructed like the Rappahannock, and there were a dozen or more in the carrying trade on the Great Lakes, to have a feed pipe running from the engine to the boiler, which was stationed in another part of the vessel; nor was the manner in which the feed pipe was incased out of the ordinary. The Titania (D. C.) 19 Fed. 101. It is not proven that the use of a threaded coupling in a feed pipe of wrought iron materially weakened the joint or pipe, or that this was an unusual construction in the year 1895, when the Rappahannock was built. Indeed, the expert testimony of the respondent indicates that such methods of construction in lake-carrying wooden vessels were common and were not thought defective. The Rappahannock was constructed of oak and her deck of pine 11 years before the mishap. She was 300 feet over all, 42.5 feet beam, 28 feet deep, and had been repaired in 1904. Although engaged since her construction in carrying all sorts of merchandise on the Great Lakes, coal, iron ore, and grain, she was without mishap or accident, and at no time was there any leakage from the feed pipe. By the Inland Lloyds' register for 1905 it appears that the Rappahannock was rated in class AI* and ⊙, signifying a high grade and approved system of water pipes. Subsequently, however, in the year 1906, after this controversy arose, her rating was reduced. It is probably true that at the present time her general construction would not be approved for carrying grain; but it is clear that in 1895, to the close of the sea-

son in 1905, her construction as to piping, etc., was not criticised, and she was not regarded as unseaworthy or unfit to carry grain.

I think the principal questions in issue are whether the feed pipe was insufficient to such an extent as to render the steamer unseaworthy at the inception of the voyage, and whether the break or crack in the pipe was attributable to the dangers of navigation. It is now well settled that, under a bill of lading such as here, the carrying vessel must be held responsible for the damaged merchandise, unless it is affirmatively shown by her that the loss was sustained because of the perils of the sea, an act of God, or of the public enemy. Jahn v. The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 54 L. Ed. 354. Under the bills of lading and proof, the Rappahannock was a common carrier; and if she was unseaworthy, or unfitted to carry the grain without injuring it en route, she must be held liable. Pope v. Nickerson, 3 Story, 465, Fed. Cas. No. 11,274; The Exe, 57 Fed. 399, 6 C. C. A. 410. In transactions of this character the contract for the carriage of the merchandise not only impliedly assures the shipper that safe and proper means of transportation will be used, but also that the vessel in all respects will be seaworthy and reasonably fit to carry the particular goods specified in the bill of lading. Assuming, therefore, the correctness of the conclusion already stated, namely, that the vessel was not unseaworthy from faulty construction of the feed pipe at the beginning of the voyage, the vital question arises whether the leak in the pipe was caused by unusual storms or violence of the seas. If such was the fact, the vessel is exonerated.

The evidence shows that the Rappahannock, which had in tow the barge Granada, was proceeding at the rate of 9 miles per hour through the water, and when approximately about 43 miles from her port of departure she encountered windstorms. It is claimed by her owner, and her master so testified, that the direction of the wind and storm on Lake Superior was such as to give the vessel an unusual strain or twist; that the storm lasted about twelve hours, and that the velocity of the wind was 60 miles an hour. The engineer testified that the sea was high over the steamer's quarter, that she rolled considerably, and that a portion of the time her wheel was out of the water. The assistant engineer testified that he had seen and experienced worse weather. The first mate said that between Passage Island and Whitefish Point the wind breezed up, blowing hard, and raised a heavy sea. The wheelsman testified that the wind was from 50 to 55 miles an hour, causing the steamer to roll some. It is further shown that on Lake Huron there was more bad weather, the wind blowing for about two hours from the west across the land. The master of the Rappahannock testified that the wind blew at the rate of 60 miles an hour. The engineer testified that the vessel labored some, but not heavily. The wheelsman, interrogated on the second storm, testified: "There was quite a little lump of a sea running." There was also a gale from the south on Lake Erie, and the steamer hauled up for the south shore of the lake to gain the lee of the land. The master of the Rappahannock, describing the duration of the storm, testified that the wind blew from 8:30 o'clock p. m. to 1:28 a. m. None of the witnesses claim or pretend that the gales were extraordinarily terrific, or that there was ex-

ceedingly heavy pitching and plunging of the vessel on the swells of the sea, although storms of the character described by the witnesses were unusual in the forepart of October. It was not supposed by any of the officers or crew of the steamer that her seaworthiness was extraordinarily tried, yet that she labored and strained in the gales which she encountered is unquestionable, although her barge was securely kept in tow throughout the entire voyage. There was no thought of the vessel foundering or going ashore, and there were no leaks in her decks or seams, though it is shown that the waves were high enough to wash her deck and break a few doors, aside from sweeping from the deck a pair of fenders which had been lashed down with rope. Her butts started on the port and starboard sides of the boiler house. The survey held after the vessel reached Buffalo shows that she had been severely strained, and because of such straining the feed pipe to the main boilers had parted at the coupling. The witness Green, one of the surveyors, testified that the oakum was spewed out of the vessel's butts, which indicated straining. The witness Gaskin, the other surveyor, states that he felt reasonably certain that the leak in the pipe arose from the straining of the vessel; that in his judgment the pipe would not have broken if the vessel had not been strained.

To refute the claim of the straining of the Rappahannock by reason of the violence of the gales, the libelant introduced in evidence, without objection, the official weather reports, tending to show that on October 9th the average hourly wind velocity at Duluth, the port at the extreme westerly end of Lake Superior, was 12.7, and the maximum 34, miles an hour. On October 10th the maximum velocity at Duluth was 27 miles an hour. The reports taken at other stations on Lake Superior, Lake Huron, and Lake Erie show the maximum velocity of the wind on different days during the voyage to have been appreciably less than estimated by the master of the Rappahannock. I am not satisfied, however, in view of the circumstances, that the weather reports should be accorded great weight. They were observations taken on land, and, at least in one instance, many miles removed from the point where the Rappahannock claims to have experienced severe weather. Mr. Cuthbertson, an experienced official in charge of the Weather Bureau at Buffalo, N. Y., testifying for the respondent, says that observations to ascertain the velocity of the wind, taken on land, would not enable a determination of its velocity on the open lake, and in his opinion heavy winds might be blowing on the lake, and not be shown by the observation on land. Corroboratory of the claim of the respondent, he testified that the weather maps of October 9, 10, and 11, 1905, show a well-defined storm area moving from British Northwest through Lake Superior, and thence easterly over Lake Huron to Lake Ontario. Hence it is clearly apparent that the Rappahannock encountered severe gales on her voyage through Lakes Superior, Huron, and Erie. Such gales and windstorms probably were not extraordinarily violent, yet they were sufficiently severe and lasting to have produced the unusual straining of the steamer, and consequent break in her feed pipe, from which water leaked on the cargo.

There is other evidence to indicate that the stress of weather caused the leakage. It is shown that in September, one month prior to the

shipment, a United States inspection of the Rappahannock and of the feed pipe was had. It appears that a hydrostatic pressure of 240 pounds was applied to the pipes and boilers, as against 160 pounds the normal pressure, with no evidence of weakness resulting from such test. Witness Kennedy testified that it is customary for the United States inspectors, when applying the hydrostatic pressure, to also test the boilers and pipes by tapping. That this was actually done, in the absence of direct testimony, may, I think, be fairly presumed. Subsequently visual inspections were made, before the loading and departure of the vessel, by the master and inspector representing the shippers and at different times by the engineer and mate, and no leaks or deterioration in the pipe casing were observed. Inspections without tapping the pipe are probably not free from criticism, although it is not clear that tapping the pipe would prove helpful to discover its actual strength. When it is considered, however, that the engines were working at the time of the inspection, and that for some time prior thereto there was a continuous water pressure on the feed pipe, the presumption is thought warranted that, had there been a leak in the pipe, it would have been discovered, even though the casing was not removed. Furthermore, it is reasonable to suppose that the hydrostatic pressure test and tapping would have disclosed any leaks or defects in the pipe. or such wear and tear as would be anticipatory of leakage.

The warranty of reasonable fitness to carry the particular class of merchandise depends upon the existence of the defect at the commencement of the voyage, and which was not discoverable by the exercise of such ordinary care as would have been disclosed by prior examination. The risk of such defect, under the warranty of absolute seaworthiness, is undoubtedly on the vessel and her owner. The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644. In the present case, however, the defect was a method of coupling and threading at a joint; but, as has been indicated, such joints were not unusual in freight-carrying vessels on the Great Lakes. Therefore, at the beginning of the voyage, in my judgment, there was no reason to believe that the strength of such pipe was weakened. It is shown by an expert witness that the soundness of the feed pipe in all reasonable expectation would not fall short of 15 years. The facts of the case at bar are quite distinguishable from those in The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688, upon which libelant lays stress. There the cap had never been severed or unscrewed from the pump hole. It had never been tested, and the court held that the vessel was bound, before going on the trip, to secure the cap against ordinary accidents. In this case there was an examination, and the pipe, in spite of its 11 years' use was reasonably fit for the voyage.

Basing my views upon the evidence, I incline to the belief that the damage to the cargo was caused by the danger of navigation, and that it would not have happened if the steamer had not encountered unusually bad weather. She was in a reasonably fit condition to resist the ordinary elements and the usual strains. The feed pipe was strong enough at the commencement of the voyage to resist the ordinary weather conditions in that season of the year. There was no rust upon the fracture, and the inferences are warranted that the leak oc-

curred during the voyage. Taking into consideration the fact that the pipe developed no leak on previous trips, the hydrostatic test by the United States inspectors and the engineer of the vessel, the inspection of the pipe and coupling by Mr. Davidson during the summer, the examinations by the master and mate, and later the engineer, just before the vessel was loaded, to discover leaks and defects, lead to the conclusion that the steamer was seaworthy at the beginning of the voyage, and, furthermore, that she was in a reasonably fit condition for the transportation in question. I am satisfied that the feed pipe, in one or the other of the gales which the vessel encountered, was so severely strained or wrenched as to cause the leak, and, unless such was the fact, the crack in the pipe is unexplained. All the probabilities are thought to indicate that the principal cause of the damage to the cargo may be assigned to the violence of the weather, and under her contract of carriage this was a peril of the sea, and she was not responsible for the injury to the cargo.

It follows that the libel must be dismissed, with costs.