## THE HARRY LUCKENBACH.

District Court, S. D. New York.

July 16, 1934.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Herbert Prem, both of New York City, of counsel), for libelants.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. deGrove Potter and John J. Heckman, both of New York City, of counsel), for claimant-respondent.

KNOX, District Judge.

This suit is in rem against the steamer Harry Luckenbach, and in personam against her owner, and is upon behalf of thirty-two owners of cargo shipped on board the vessel from various American West Coast ports in March and April, 1930, for delivery at Philadelphia, New York, and Boston, and which was damaged in transit.

The merchandise involved was stowed either in No. 4 'tween deck or No. 4 lower hold.

Upon discharge, it was found to be in bad condition through contact with sea, and perhaps some fresh, water. The evidence is that the water gained entrance to the cargo compartments through an opening along the seam of a 1½-inch galvanized iron drainpipe, some 3 or 4 feet above the 'tween deck ceiling. The pipe served washbasins and shower baths located in the crews' quarters on the starboard side of the poop deck. It ran through the shelter deck and into No. 4 'tween deck, and connected with a cast-iron fitting having an outlet, protected by a clapper valve, onto the skin of the vessel, at about the 31-foot mark. Upon leaving San Francisco, this mark was between 2 and 3 feet above the water line.

The presence of an undue quantity of water in the holds was revealed while the vessel was en route between San Pedro and Philadelphia, but the source of leakage was not discovered until arrival at the last-named port. An examination there made disclosed the split pipe above mentioned and also a crack of about 3 inches in the collar of a lead soil pipe made fast by an iron flange to the fitting of the drainpipe outlet. The leakage due to the crack in the soil pipe was small, and need not be considered. Most of the leakage through the drainpipe, due to the location of the defect, was probably occasioned by the wash of the sea which forced water into the pipe, and into the 'tween deck. So great was the inflow, that bags of beans stowed in the 'tween deck were caused to burst, their contents clogging the scuppers. The coamings about the hatchway leading to the lower hold, being but 3 inches in height, became inundated, the water thus reaching cargo in that compartment. Such of it as was not absorbed by the freight drained forward to a well having dimensions of 4 feet by 12 feetx48 in.

The answer of claimant-respondent pleads exemption from liability under the terms of the bills of lading, all of which, with one exception, are substantially alike. Reliance is also placed upon the Harter Act (46 USCA §§ 190–195), and the alleged failure of libelants to comply with the provisions of the notice of claim clauses contained in the bills.

Continuing with the facts, it appears that the Harry Luckenbach is a large twin screw, steel cargo carrier. At the time of this voyage, she carried the highest rating of both Lloyds and the American Bureau of Shipping. Her hull is divided in four cargo holds served by a total of eight hatches, Nos. 7 and 8 opening into No. 4 hold, which is next the stern. This compartment, as do the others, carries a 'tween and shelter deck. The last is equipped with four scuppers, two upon each side. They lead downward, and just below the deck level connect with a like number of 'tween deck scuppers. They then give into shaft alleys, and run forward as one pipe to the engine room bilge.

The injured drain and soil pipes were supported through the shelter and 'tween decks along sweat boards on the ship's sides. In order to protect them from injury through contact with cargo, they were encased in a fitting of three planks, built solidly about them. This casing, although open at its bottom reach, was not such as to permit inspection of the pipes along their lengths.

The Harry Luckenbach, before proceeding to the west coast, had drydocked at Boston. Routine repairs and painting were done. At the same time, cargo space was examined and found in order, and free from signs of leakage. Scuppers were duly tested and showed clear. No visual inspection of the pipes which subsequently opened was had, and none had been made since 1927. The pipe itself was ten years of age.

Loading at Boston, Philadelphia, and New York, the vessel sailed for the Pacific Coast, and had an uneventful trip. None the less, while the ship lay at San Pedro, taking fuel oil, a sounding pipe leading to the after-peak tank was found to have fractured. Repair was made at Seattle. Thereafter, as the boat proceeded along the Columbia River towards Portland, her starboard propeller struck a log, and was injured. When this occurred, the vessel was subjected to heavy vibration, but it was quickly overcome by lowering speed. No cargo then on board gave any sign of water damage. East-bound cargo was loaded at Portland, Seattle, and Bellingham. At Seattle, the ship went into dry dock for repairs to the propeller. At the same time, she underwent examination by surveyors of the American Bureau of Shipping, Lloyds, United States Salvage Association, Salvage Association of London, and by respondent's superintending engineer; particular attention being paid to lower hold No. 4. Nothing out of the way came to light. But once again the pipes within the plank casings were unnoted; it being assumed, since no evidence of leakage was visible, that they were in good condition.

The vessel proceeded down the coast and docked at San Francisco. Crossing the bay to Oakland and Alameda, where cargo was received, she returned to Pier 31, San Fran-

cisco, to finish loading. While there, she lay bow in with her starboard side to the pier. When ready to sail in the late afternoon of April 3, 1930, the lines were cast off, and the propellers put at full speed astern. The purpose of this was to enable the craft to overcome the force of a strong ebb tide, at the pier ends, which were to be cleared by about 500 feet. The plan was that the vessel would then turn to port, and proceed to sea. In the course of executing this maneuver, and before reaching the pier end, the steamer was caught by a current and carried from alongside the pier into the slip. Continuing to make sternway, she was struck by the ebbing tide, and swung more or less violently against piling at the end of the pier. Her master, believing his vessel not to have suffered serious damage, put out to sea. When safely on his course, he and one or two officers looked over the railing to starboard in order to ascertain if the hull showed any effect of collision with the piling. Some scraped paint was all that was noted.

While en route to San Pedro, heavy rollers were encountered, but nothing unusual. Soundings were taken of the bilges, and showed 23 inches of water in the well of No. 4 lower hold, and 21 inches in the engine room bilge. This meant that the vessel was then carrying two tons of water. Nevertheless, the circumstance gave no concern. Arrived at San Pedro, the Master and other officers looked again to see if damage had been done to the vessel's side. Upon this occasion, in addition to scraped paint, they observed an indentation of plates. They did not, however, ask assistance from a surveyor. The discharge outlet of the drain and soil pipes was uninjured. The officers, therefore, reached a conclusion that the vessel was quite able to continue her voyage to the eastern seaboard.

At the completion of loadings at San Pedro, the vessel got away on the afternoon of April 4th. She met with rough weather, and upon April 11th the well in the lower hold showed the presence of fifty-two inches of water, a height which was above the hold's ceiling to the extent of four inches. The translation of this measurement into pounds indicated the presence of twenty tons of water. Such a calculation, of course, would not fully represent water that had soaked into cargo. From April 11th until the end of the voyage, the bilge well was pumped almost continuously. Efforts were made to discover the point at which water was entering the ship, but they were of no avail until Philadelphia was reached. The bursted pipe was then removed, and temporary repairs made. The lead pipe also was plugged. The vessel proceeded to New York and Boston, and, upon discharge of cargo at the latter port, a survey was held by surveyors representing hull underwriters, Lloyds, American Bureau of Shipping, and cargo interests. Several plates on the vessel's starboard side were found to be bent, together with a few set in frames. All surveyors agreed that these injuries, as well as the fracture of the two pipes, were reasonably attributable to the collision in San Francisco.

At the trial, libelants sought to show the nature of the defect found in the cast-iron drainpipe was such as to indicate that it had probably been weakened by frost in a prior winter season, and had finally opened up when subjected to sea pressure. It was testified that the collision, had its force been transmitted to the pipes, would have broken the pipe at one of its threaded ends, and would not likely have opened the seam. Point also was made of claimant-respondent's failure to preserve and produce for inspection the pipe length containing the defect. It was further objected that, when the vessel reached New York, and a surveyor undertook to examine her on behalf of cargo owners, he was refused access to the ship. By way of response to the criticism having to do with the disappearance of the pipe, it was contended that, since witnesses who saw the opened pipe upon its removal have testified its wound was without sign of corrosion or other deterioration, there was no need for keeping a useless piece of iron. As to the second unfavorable inference I am asked to draw, claimant-respondent avers that the refusal to allow access to the surveyor representing cargo interests was directed to a man who was personally distasteful to claimant, and was not due to unwillingness to subject the vessel to a critical inspection. In support of this contention, it is pointed out that, when the vessel reached Boston, she was opened to cargo claimants as well as to other persons in interest.

In addition to saying that the ship was unseaworthy at the commencement of her voyage by reason of the failure of claimant-respondent to use due diligence in inspecting her pipes, libelants assert another alleged cause of unseaworthiness. It is that the vessel did not utilize the services of a tug when unberthing at San Francisco. The proof satisfactorily shows that it was not there cus-

tomary, or usually necessary, for freight ships to have assistance from tugs when leaving their pier. Although tugs frequently are used, the matter is one resting within the judgment and discretion of the master in command. Such was the fact in this case. This very vessel had made many trips in and out of piers in San Francisco under command of Capt. McKinnon. A few days before sailing on the voyage in question, she left her pier and crossed over to Oakland. She had no tugs then, nor did she have them on many other occasions. I have not the slightest doubt that the maneuver undertaken, and which resulted in harm to the ship, was one that did not, in the judgment of the master, call for a tug's assistance. But, even though he erred in this regard, his fault in unberthing the ship, provided due diligence to make her seaworthy had previously been exercised, should be regarded as an error of navigation within the protection of section 3 of the Harter Act (46 USCA § 192). Hanson et al. v. Haywood Bros. & Wakefield Co. (C. C. A.) 152 F. 401.

[■■] Returning, now, to evidence having to do with the defective drainpipe, my finding is that, while the vessel's collision with the pier may have been the immediate cause of opening up of the seam weld, there is nothing in the case which excludes the existence of a previously defective condition. Indeed, the type of injury tends to indicate the existence of a defect which reduced the pipe's resistance at full thickness to a point below that at the threads, and that this antedated the collision. See The Rappahannock (C. C. A.) 184 F. 291. It is highly unfortunate that the injured length of pipe was not preserved and exhibited to the surveyors. Claimant-respondent knew the damage that had come to libelants' cargo would result in heavy claims and in litigation, and that this pipe and its defect would probably control the outcome. Yet it permitted the corpus delicti to disappear, quite content that the nature of its wounds should be described by witnesses more or less interested. Without any purpose to impugn the testimony of any of them, it stands to reason that they have in no way maligned the condition of the pipe.

Putting aside the inference that easily could be drawn from the present nonexistence of the pipe, and assuming, as I do, that claimant-respondent was not acting in bad faith in excluding libelants' surveyor from the ship when he sought to go aboard, I am nevertheless of the opinion that claimant-respondent has failed to establish that the collision with the dock, rather than a possible defect in the pipe, was the basic cause of the opening of the seam. Hence the question of claimant-respondent's diligence in examining the pipe must be faced and decided. Upon this subject, claimant-respondent must sustain the burden of proof. May v. Hamburg-Amerikanische, etc., 290 U. S. 333, 54 S. Ct. 162, 78 L. Ed. 348. The decision just cited also holds that under the Harter Act § 3 (46 USCA § 192), there need be no causal relationship between a vessel owner's lack of due diligence in making his ship seaworthy and the subsequent damage which may come to cargo he undertakes to carry, in order to subject him to liability. See, too, The Edwin I. Morrison, 153 U. S. 199, 215, 14 S. Ct. 823, 38 L. Ed. 688.

[■] The pipe that gave way on the Harry Luckenbach, passing through cargo space as it did, and being constantly open to the pressure of sea water whenever the vessel rolled in heavy seas, was a constant source of potential danger to cargo. In winter, as well as in summer, the ship was subjected to the temperatures prevailing in northern latitudes, in port and out, in fresh water and salt. A temporary stoppage of the pipe on a cold winter's night in New York, Philadelphia, or Boston, or at a North Pacific port, might easily mean ice in the pipe, and consequential injury. Notwithstanding, the pipe had not been inspected in more than three years. A short time before the beginning of this very voyage, as previously stated, and for an unexplained reason, a sounding pipe went bad. Soon thereafter the ship's propeller struck a log in the Columbia river. This, undoubtedly, caused the pipe to shake with more or less violence. The heavy wooden casing which required a crowbar for its removal at Philadelphia stood always in the way. The boards extended below the cast-iron fitting, and, as Wallin testified, the pipe which developed trouble could not possibly be seen. Apparently, too, it was not, and could not be, subjected to a hammer test. The vessel's owners and agents, in the absence of visible signs of leakage, were content to assume the soundness of the pipe.

The appellate court for this circuit, upon several occasions, has held vessel owners to liability when they failed to maintain pipes and valves in such manner as to permit of ready inspection. See W. R. Grace & Co. v. Panama R. Co. (Blyth, Green, Jourdain & Co., Inc., v. Panama R. Co.) (C. C. A.) 285

F. 718; The Alvena (D. C.) 79 F. 973, and The Julia Luckenbach (C. C. A.) 235 F. 388.

The bills of lading in this suit carry the following exception: "16. Neither the carrier nor the vessel shall be liable for loss, damage or delay whether occurring before, during or after loading, transshipment, discharge, delivery or other disposition of the goods arising from the following causes: Act of God ° ° * perils, dangers or accidents of the sea * * ° dangers or accidents incident to navigation, by collision ° ° * even when occasioned by the negligence, default or error in the judgment of the pilot, master, mariners or other servants of the shipowner or operator of the vessel, not resulting, however, in any case from want of due diligence from the owner or operator of the ship or any of them or by the ship's husband or manager or any latent defect in hull or appurtenances, even though existing at the beginning of the voyage and not discoverable by due diligence, unseaworthiness, even though existing at the time of shipment or at the beginning of the voyage, provided the shipowner ° * * has exercised due diligence to make the vessel seaworthy * * * causes beyond the carrier's control * * * fresh water, salt water, sea water * * * mold ° * * rust, stain, discoloration, dampness, * * * drainage, leakage. * * * "

Claimant-respondent, in my opinion, is not entitled to the benefit of the foregoing provisions. Seaworthiness of the vessel at the beginning of the voyage for the reasons set out has not been sufficiently established, and claimant-respondent's lack of due diligence in inspecting her for seaworthiness has disqualified it from taking advantage of the Harter Act (46 USCA §§ 190–195). From this, it follows that the master's fault in allowing the ship to strike the pier with such violence as to open the drainpipe is chargeable to the ship and her owners. Nothing said in the bills of lading relieving the vessel from damage by water can affect responsibility for negligence, if once established as an efficient cause of injury. The Florinda (C.

C. A.) 31 F.(2d) 262, 264. It is error for respondent to assume that negligence in navigation is necessarily excluded.

This opinion, already too long, must further be extended in order to deal with contentions made concerning the notice of claim clauses of the bills of lading. These specify that the cargo owner

"22. Shall make all claims for damage to cargo, misdelivery or delay in delivery thereof, or shortage of packages or portions of packages of the herein described cargo, fully disclosing the nature and extent thereof in the presence of the captain and/or agent of this company and/or of the delivering carrier at destination before the cargo is removed from the carrier's custody or final receipt signed. Unless written demand for payment of claims for damage, misdelivery or delay in delivery or shortage of portions of packages of the herein described cargo shall be made upon the carrier liable therefor, or upon the carrier that actually delivered the goods, within ten (10) days after delivery, all claims for damage of whatsoever nature and extent shall be taken to have been waived. * * * "

The foregoing provision recently engaged the attention of the Circuit Court of Appeals for this circuit in The J. L. Luckenbach, 65 F.(2d) 570. The clause was held valid, and it is the position of claimant-respondent that, under the interpretation there put upon the contract, only one of the present libelants, viz., Susman-Wormser & Co., complied with the requirements of the clause. Claimant-respondent's admission of compliance on the part of this cargo owner is enough to warrant me in sending the case to a special commissioner. Since the proof having to do with the action taken by other consignees with respect to their shipments is both voluminous and variable, I feel justified in committing authority to the commissioner to examine the same, and to find which of the cargo-claimants, if any, is entitled to prove damages, and to compute the amount of such damages as were suffered by any or all of them.