### THE TENEDOS.

(District Court, S. D. New York. April 28, 1905.)

1. SHIPPING—DAMAGE TO CARGO—UNSEAWORTHINESS FROM LEAKING PORT.

If a ship starts on a voyage with a port negligently left open, causing damage to cargo, her owners are liable for failing to provide a ship seaworthy at the beginning of the voyage, and are not protected by section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), on the ground that the fault was one in navigation or the management of the vessel, although proper appliances for closing the ports were furnished; and this rule is especially applicable where the ports were so located as to be submerged when the vessel was fully loaded.

2. SAME—LIABILITY OF OWNERS—FAILURE TO EXERCISE DUE DILIGENCE.

A steamship originally constructed for passengers, but later used for the carriage of goods, had ports in the lower between-decks, which were submerged when she was fully loaded. These were equipped with glass bull's-eyes, and shutters for properly closing the same. On commencing to load cargo at Batoum the ports in a compartment were examined and found properly closed, and the compartment was then partially filled with wool. The vessel stopped at a number of other ports on the Black Sea and the Mediterranean, and took on more cargo; the hatchway leading to such compartment being used, and finally closed when she started on the voyage for New York. Shortly afterward water was discovered in the hold under such compartment, and on examination it was found that one of the glass bull's-eyes had been stolen, and that the water had entered through such port and damaged the cargo. The brass pins holding the bull's-eyes in a number of the other ports had also been removed. No inspection of the ports had been made after the loading commenced at Batoum. *Held*, that due diligence on the part of the owners to render the vessel seaworthy when she commenced the voyage required that such inspection should have been made the last thing before access to the ports was cut off, and that the damage to cargo was due to unseaworthiness for which the vessel was liable.

In Admiralty. Suits to recover for damage to cargo.

Black & Kneeland (Lawrence Kneeland, of counsel), for libelants Stephenson & Craft, Galanopulo, National Board of Marine Underwriters, and William H. Harris.

Ritch, Woodford, Bovee & Butcher (Frederick C. Tanner, of counsel), for libelant Hills Bros. Co.

Wing, Putnam & Burlingham (Harrington Putnam, of counsel), for the Deutsche Levante Linie, claimant of SS. Tenedos.

HOLT, District Judge. These suits are brought to recover for damages to a portion of the cargo of the steamship Tenedos, caused by water leaking through a port. The Tenedos was originally

built for a passenger steamer, and subsequently used as a freight steamer. She had four hatches. No. 3 hatch had four compartments. At the bottom was the hold; then the lower between-decks; then the upper between-decks; then the spar deck. In the lower between-decks compartment of this hatch there were ten ports—five on each side—placed within a few inches of the floor above. They were constructed in the usual manner of ports on modern vessels. The port was circular, and fitted with a glass bull's-eye, with a brass rim, opening horizontally on a hinge, to afford light and air. The port was also fitted with an iron disk or blind, which, when the port was not used, was placed in the bottom of the porthole, flush with the outside of the ship, and slightly fastened with red-lead putty. Against this disk the glass bull's-eye was closed and bolted fast. Then over the glass bull's-eye was brought down an iron shutter, swinging from a hinge above the port, and that inside shutter was bolted at the bottom. The shutter was smaller than the bull's-eye, so that, when closed, the brass rim of the bull's-eye was visible. The ports in No. 3 lower between-decks were 21 feet 6 inches above the keel, and the vessel, when fully loaded with cargo, drew a little more than that, so that when the vessel was fully loaded these ports were submerged. All the ports in the vessel were overhauled and put in good order at Hamburg in May, 1903. The vessel thereafter came to New York, and took in a cargo of grain, which she discharged at Alexandria in good order. She then proceeded light to Batoum. When she arrived at Batoum a careful examination of the ports was made by the first officer and the carpenter, to see that they were tight and secure, and they were found to be so. Two or three days afterwards wool in bales was loaded into No. 3 lower between-decks, until that compartment, except the hatchway, was substantially full; but, the bales being of different sizes, there were spaces between the top of the wool and the floor above, varying from one to two feet, over which a person could crawl until he came to the side of the vessel, and to the ports there. After leaving Batoum, the vessel called at various ports on the Black Sea and the Mediterranean. At some of these ports she loaded cargo into the hold of No. 3, and it was not until she was nearly ready to sail for New York that No. 3 hatch was so full that no one could get through it into the between-decks compartment. She completed her cargo at Patras, Greece, and sailed from there for New York on September 30th. On October 5th ten feet of water was discovered in the hold of No. 3 hatch. The ship thereupon started her pumps, and ran for Algiers, where she arrived the next day. There it was found upon examination, after removing the cargo from No. 3, that from nine of the ten ports in the lower between-decks compartment the brass pin upon which the hinge of the bull's-eye turned had been removed; that on various ports were marks and scratches apparently made by some sharp tool or instrument; and that in the after port, on the starboard side, the bull's-eye itself was missing, the inner iron shutter having been afterwards closed again and bolted. This left no support for the outer iron disk or plate, and it had worked loose

and fallen in against the inner iron shutter, permitting the water to leak through the port; thus damaging a large portion of the cargo in the hold and the lower between-decks. There is no direct proof in this case how this bull's-eye and the brass pins were removed. I think that the necessary inference is that they were stolen by a thief, who probably was not a member of the crew, after the ports were inspected at Batoum.

The bull's-eye could not have been removed after the hatches were closed. It follows that it must have been removed before the Tenedos sailed from Patras for New York. She was therefore unseaworthy when she sailed. The question, therefore, both under the bills of lading and the Harter act, is whether her owners used due diligence to make her seaworthy. The burden of proof upon that question, unseaworthiness at the time of sailing being established, is on the owners. The Edwin I. Morrison, 153 U. S. 199, 215, 14 Sup. Ct. 823, 38 L. Ed. 688; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65. The diligence imposed upon a shipowner to see that the vessel is seaworthy before starting upon a voyage is spoken of in the case of The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130, as the utmost care and diligence; and, clearly, due diligence calls for especial attention at those points where the likelihood or possibility of unseaworthiness is most obvious. The port in question was submerged when the ship was fully loaded with cargo. It seems to me clear, therefore, that the shipowners were bound to exercise a very high degree of diligence to make sure that such a port, which would be submerged during the whole of her return voyage to New York, was secure. The owners of the Tenedos provided entirely proper ports. They were properly overhauled and put in perfect order at Hamburg, and they were properly examined at Batoum, and found to be then in perfect order and securely fastened. Two or three days passed at Batoum before the wool was 'loaded in the lower between-decks of No. 3 hatch, and the compartment, except the space of the hatchway, was then filled with wool up to within one or two feet of the floor above. The vessel then sailed from Batoum, calling at a number of other ports, at some of which cargo was placed in the hold of No. 3 hatch. The hatch does not seem to have been filled up so that no one could get into No. 3 lower between-decks until shortly before the Tenedos sailed from Patras for New York. Cargo was loaded in the hold of No. 3 at Constantinople, Smyrna, Kalamata, Patras, and Katakolo. The claimant contends that the theft of the brass pins and the bull's-eye did not take place at Batoum, but probably took place at Patras or some other of the Greek ports last visited, because there were other thefts of articles on the ship at Patras, and the Patras merchants loaded their goods there with their own men, which was not the custom at other ports. But I do not see that there is any adequate proof that this theft took place in any particular port, and it seems to me that it could have been more easily accomplished at Batoum, during the two or three days after the ports were inspected, and before the wool was put in, than at any of the later ports, after the No. 3 lower between-decks was filled

with wool. If the theft took place at Batoum, before the wool was put in, I think it clear that due diligence was not used to discover it. Certainly it seems to me that due diligence is not shown in examining the ports of a vessel, if, at the end of the work of filling the compartment in which the ports are, a careful search is not made to see that the ports have not been opened, and are in good condition and are properly secured, and particularly if the ports are so situated that when the ship is loaded they will be submerged. If the theft took place after the wool was placed in the lower between-decks, the omission to inspect the ports further before sailing is undoubtedly not so obvious an omission of due diligence. It is testified that when cargo was being loaded there was always a watchman on duty about the compartment, and an officer tallying the cargo, and that the hatches were always put on at night, and a watchman on duty on deck. But at all the ports at which cargo was put in No. 3 hold, under the wool, the hatchway was open, with an iron ladder leading down to the hold. A man going to or coming from the hold could step off upon and crawl over the wool in the lower between-decks to the ports, and although it may be admitted that the officers of the Tenedos were not bound to be on the watch for such an extraordinary and unprecedented theft as occurred in this case, it does not seem to me too strict a rule to hold that they were bound, before finally closing the hatches and starting on a voyage across the Atlantic, to make a final inspection of the ports—particularly those that would be submerged—in order to be sure that they were secure. Such ports are sometimes opened by workmen for air or light. If they were not fastened securely, they, of course, would admit water to the ship, and they were the most obvious source of danger in that respect. While, therefore, I do not think that the officers of the Tenedos were negligent in omitting to suspect thefts of the kind which occurred, I think that they did not exercise due diligence in sailing for New York without making a final inspection of the ports, from the inside of the vessel, before finally closing the hatches in each compartment. If they had done so, with proper light, either from the open hatch or a lantern, they could hardly have failed to notice the absence of the brass rim of the bull's-eye, which must have caused the interior appearance of the port from which the bull's-eye had been stolen to be noticeably different from the others. At all events, it cannot be assumed that they would not. I think the evidence shows, too, that the absence of the brass pin from the bull's-eye hinge in all of the ports but one in that compartment could have been seen upon inspection, and, although it is possible that, if such an inspection had been made, the thefts would not have been discovered, it nevertheless seems to me that the entire neglect of any inspection of these ports after the inspection made the first day the ship arrived at Batoum shows that due diligence was not exercised to make this vessel seaworthy.

Evidence was given for the Tenedos, by three experienced captains, which is claimed to show that there was as much examination of the ports made in this case as on other vessels. But the fact that

shipowners are not in the habit of using precautions which would demonstrate unseaworthiness is immaterial. They are bound to use them. The Edwin I. Morrison, 153 U. S. 217, 14 Sup. Ct. 823, 38 L. Ed. 688. Of the witnesses called, however, two admitted that they considered it the duty of the officers of such a vessel to examine the ports at each stage of a voyage before leaving port. No such examination took place in this case after the vessel left Batoum, although she stopped at a number of different ports in the Levant. In cases in which ports have been negligently left unclosed by the crew before sailing, it has been held that due diligence was not shown by proof that they were inspected and found in order before the work of loading ended, but that they should have been inspected the last thing before the hatches were closed or the voyage begun. International Nav. Co. v. Farr & Bailey Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830; The Manitoba (D. C.) 104 Fed. 145.

The claimant's counsel argues that the owners did their duty in furnishing proper ports, and that the omission of the officers to keep them properly closed, or to discover that they had been tampered with, was a fault in the navigation or management of the ship, within the meaning of the third section of the Harter act (Act Feb. 13, 1893, c. 105 [U. S. Comp. St. 1901, p. 2946]). This view was apparently held at one time by the United States Supreme Court. The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. But that court later distinguished that case, and it is now well settled that if a ship starts on a voyage with a port negligently left open, causing damage, her owners are liable for failing to provide a ship seaworthy at the beginning of the voyage. International Nav. Co. v. Farr & Bailey Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830. And I think that, in the case of ports situated so low in the vessel as to be submerged when the vessel is fully loaded, such a rule is especially applicable. Such ports can have, under such circumstances, no function as ports. They are simply part of the side of the ship, and must be made as secure against leakage as the rest of the hull.

My conclusion is that the libelants are entitled to a decree, the amount of the damage to be ascertained upon a reference.