## THE BENJAMIN NOBLE.

(District Court, E. D. Michigan, S. D.   February 23, 1916.)

1. SHIPPING ⬦137—LIMITATION OF LIABILITY—DUE CARE IN SELECTION OF OFFICERS.

   That the captain of a vessel for the voyage on which she was lost had never before served in that capacity is not of itself sufficient to charge the owner with negligence which will debar him from the right to limit his liability.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ⬦137.]

2. SHIPPING ⬦209(3)—LOSS OF CARGO—LIABILITY OF VESSEL—BURDEN OF PROOF.

   Proof that a cargo was delivered on board in good condition, and that it was not delivered to the consignee, casts on the owner of the vessel the burden of proof to show that the loss was within one of the exceptions for which it is relieved from liability under the bill of lading or the Harter Act.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 652; Dec. Dig. ⬦209(3).]

3. SHIPPING ⬦137—LIABILITY FOR LOSS OF CARGO—"SEAWORTHINESS."

   The question of the seaworthiness of a vessel includes the question of whether or not she was overloaded.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ⬦137.]

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. SHIPPING ☞209(3)—LIABILITY FOR LOSS OF CARGO—SEAWORTHINESS.

On an issue as to the liability of a shipowner for loss of cargo, any doubt as to the seaworthiness of the vessel must be resolved in favor of the shipper.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 1652; Dec. Dig. ☞209(3).]

5. SHIPPING ☞138—LIMITATION OF LIABILITY—UNSEAWORTHINESS—OVERLOADING.

The steamer Noble left Conneaut, Ohio, for Superior, Wis., in April, for her first trip of the season, with a cargo of 2,951 tons of steel rails, and was lost in the west end of Lake Superior in a gale with all on board. She was a steel vessel, 5 years old, built for carrying pulp wood, and having bulwarks with gates opening outward. She was designed for a draft of 14½ feet when loaded, but she was loaded on this voyage to a depth of 18 feet and almost "decks to," having a freeboard of no more than 2 inches. She had never before carried so heavy a cargo, except perhaps on two occasions in the summer season. There were other vessels in the gale, some larger and some smaller, but none were lost. *Held*, that in view of the season, when gales such as the one encountered were reasonably to be anticipated, the Noble was overloaded and for that reason unseaworthy for the voyage, and that her owner, which was responsible for the overloading, was not entitled to a limitation of liability.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ☞138.]

6. SHIPPING ☞138—LOSS OF CARGO—SEAWORTHINESS—OVERLOADING.

In determining the safe loading of a vessel as to weight of cargo, the guiding thing should be her draft.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ☞138.]

7. SHIPPING ☞137—LIMITATION OF LIABILITY—OVERLOADING VESSEL—CUSTOM.

A shipowner is not relieved from responsibility for overloading his vessel to the point which renders her unseaworthy by the fact that other owners habitually do the same thing.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ☞137.]

8. SHIPPING ☞74—CORPORATION OWNER—REPRESENTATION BY MANAGING AGENT.

A corporation shipowner is responsible for the acts of its managing agent done in his capacity as such agent.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 320; Dec. Dig. ☞74.]

In Admiralty. In the matter of the petition of the Capitol Transportation Company, as owner of the steamer Benjamin Noble, for limitation of liability. Claim of the Cambria Steel Company, cargo owner. Limitation denied, and decree for claimant.

Sherwin A. Hill and Carl V. Essery, both of Detroit, Mich., and Francis S. Laws, of Philadelphia, Pa., for claimant.

George L. Canfield, of Detroit, Mich., and Frank S. Masten and Fred L. Leckie, both of Cleveland, Ohio, for petitioner.

TUTTLE, District Judge. The steamer Benjamin Noble was built at the Detroit Shipbuilding Company's plant in 1909, and was 240 feet between perpendiculars, 255 feet over all, 42 feet beam, and 18 feet

molded depth. She was built for the so-called "canal trade" and for the particular trade of carrying pulp wood. The maximum draft for the Welland Canal, through which she was intended to operate, is 14–6. She had a speed of 10¼ miles an hour. She was a steel boat with steel houses and wooden hatch covers. She was what is known as very sheer, in that her deck raised very rapidly as you went forward from No. 5 hatch, being about 6 feet higher at her extreme bow than at the lowest point in her deck. Her deck was also crowned, being 10 inches higher in the middle of the beam than at the edge of the deck. It was intended that she would carry a large portion of her cargo of pulp wood on deck, and her decks were correspondingly well and strongly constructed. She had bulwarks, and at intervals there were gates swinging outward for the purpose of discharging water which might come on deck. She engaged in trade on the Great Lakes in the year 1909, and each year thereafter until the unfortunate trip in question, when in April, 1914, with the 20 men constituting her crew, she was lost on Upper Superior.

During her entire existence she was owned by the Capitol Transportation Company and was managed by its agent, Mr. Francombe, of Detroit, a man of many years' experience on the Lakes, as a chief engineer on steamboats, and also of many years' experience as a managing agent of boats on the Great Lakes. The local vessel agent at Cleveland for the Noble was Mitchell & Co., and she had local vessel agents in other lake ports.

Prior to the opening of navigation in the spring of 1914, the Cambria Steel Company of Pittsburgh, Pa., communicated with Hanna & Co. of Cleveland, who are brokers for freight business, and advised them that they had 3,000 tons of steel rails which they wished to ship from Conneaut, Ohio, to Superior, Wis., as soon as navigation opened in the spring. Thereupon, a representative of Hanna & Co. called up Mitchell & Co. and asked them whether they could furnish a boat to carry 3,000 tons of steel rails. Mitchell & Co. communicated with Mr. Francombe, and a contract was made between the Capitol Transportation Company, represented by Mr. Francome, and the Cambria Steel Company, represented by Hanna & Co., for the transporting of these rails on the Noble at a rate of 80 cents per ton.

[1] Among other duties intrusted to Mr. Francombe as the managing agent of the Noble was the duty of selecting a master, and he selected for the season of 1914 Capt. Eisenhardt, who had been employed on boats somewhat similar to the Noble. While he had never been master of a ship, he had many years of experience in all of the minor positions, at the forward end of the ship, and he was well qualified for advancement from mate to master. He was not only recommended at this time to Mr. Francombe, but in advance of the season of 1913 he had made application to Mr. Francombe for a position and was at that time well recommended, so no fault can be found with the Capitol Transportation Company because of Mr. Francombe's selection of a master. To say that vessel owners were negligent because they selected a man who had never before been a master would make it almost impossible for men to advance in their work, and secure ulti-

mately the highest position on a ship. On the other hand, in considering this case and the relations of the parties and the duties which the owners of the ship owed to the master, crew, and cargo, it should be borne in mind that the master was for the first time to take command of a ship, and that he had never served upon the Noble in any capacity. So we start in with this well-built and seaworthy ship (as to condition of hull and construction) at Conneaut, with a master and crew qualified for their positions; with the owner of the ship having made a personal contract with the owner of the cargo to carry 3,000 tons of steel rails on the first trip of the season from Conneaut to Superior.

There is nothing in the situation to show that the Cambria Steel Company or any of its agents undertook in any way to select the ship. They had a cargo which they wished to transport, and they conveyed this information to those engaged in the trade of carrying on the Lakes. The owners of the Noble, learning of the freight to be carried, undertook with the owners of the cargo to transport it and offered and contracted for the Noble as a suitable carrier.

The steel rails were brought to Conneaut in gondola cars. The captain was in charge of his ship. The men on the dock began to unload the rails from the cars to the boat by means of whirleys. While that work continued, the captain of the Noble called up Mr. Mitchell, of Mitchell & Co., each day at 11 o'clock, to let him know how the work was progressing. On Friday, April 17, 1914, Capt. Eisenhardt from Conneaut telegraphed to Mr. Francombe, the managing owner at Detroit, as follows: "Will be loaded Saturday noon. Mitchell wants 3,000 tons to go if possible. Please advise." To this telegram Mr. Francombe promptly replied: "Think 3,000 tons too much. Best take all you possibly can." Capt. Eisenhardt took 2,951 gross tons of the rails, leaving one carload, which would be about 50 tons.

The Noble had wintered at Cleveland and was only partially inspected at Cleveland before leaving for Conneaut, arrangements having been made that the spring inspection would be completed at Detroit, in order to avoid delay at Cleveland.

The Noble left Conneaut Saturday, April 18th, reaching Detroit shortly after noon on Sunday, April 19th. She remained at the dock in Detroit until Thursday morning, April 23d, during which time her inspection was completed, and repairs were made to her steering gear. While she was at Detroit, Mr. Francombe was aboard several times, looking over the ship and cargo, and talking with the captain, and he was familiar with the entire situation.

On Thursday, April 23d, she continued her up-bound trip, and we hear of her next at the Soo, where she was locked through the Poe Lock late Saturday afternoon, April 25th. We next hear of her at 2 o'clock on the afternoon of Monday, April 27th, somewhere about 20 miles off Portage Canal. This would make her about a day late, considering the time she passed the Soo, provided she had at all times continued at normal speed on her course. Nothing has been shown to explain why she should have been delayed the 24 hours. However, that is not a matter of any importance in this controversy, because when

seen at 2 o'clock on the afternoon of Monday, April 27th, she was continuing on her course, evidently at her usual speed. Possibly it can be accounted for, in this, that her barometer may have shown some evidence of the storm that was approaching or some other storm, and she may have remained anchored until such time as she thought the weather conditions were favorable. No one is able to identify the Noble as having been seen thereafter.

As to what occurred thereafter, we are compelled to rely upon an accumulation of evidence from various outside sources for our conclusions, and, of necessity, the particular things which happened to the Noble thereafter are shrouded in some mystery and doubt. We do know that a heavy storm came on from the northeast, beginning at about 3 o'clock in the afternoon of April 27th, gradually increasing in severity until the wind had reached its maximum velocity, about 7 o'clock in the morning of the 28th, continued during the entire day of the 28th, and that on Wednesday morning, April 29th, pieces of hatch covers, a piece of oar, cordage, and a life raft from the Noble were washed ashore at Minnesota Point, between the Duluth and Superior entrances, giving unmistakable evidence that the Noble had been lost. None of the bodies of the 20 men constituting the crew have ever been found. No additional portions of the wreckage have ever been found, except on Thursday, April 30th, when the life-saving crew at Minnesota Point worked with their boat back and forth over the west end of Lake Superior and in their search found, at a point about 3 miles off the north shore and about 10 miles to the eastward of Minnesota Point, three pieces of wreckage, viz., a hook with a piece of wood attached to it, which evidently had come out of one of the cabins, a piece of the bridge, and a piece of a strong back from one of the hatches.

I should not want to be understood as feeling sufficiently certain about the exact time or place that the Noble went down, to make a positive finding in that regard. No one of the particular bits of evidence offered are conclusive; but, taking all of them together, we can be reasonably certain as to the time and locality in which the final misfortune came. The wreckage is of some assistance in this determination. There is a backset to the water when the wind is sufficiently high to raise the water at Minnesota Point, and that backset is not so great while the wind continues as it is when the wind goes down, and while the wind continues that backset is probably below the surface of the water rather than at the surface. I doubt that the three pieces of wreckage found on April 30th had ever been down to the beach at Minnesota Point. I think the wreck occurred somewhere to the eastward of where this wreckage was picked up on the 30th. Undoubtedly, the wreckage which came ashore on the morning of the 29th at Minnesota Point left the Noble at the same time and place as the wreckage which was found on the 30th, 10 miles down the Lake. The fact that neither the lifeboats from the Noble nor any of the bodies of the crew were found leads me to think that the Noble went down quickly and while the men were inside. No wreckage was found except the things that wind and water would knock off. I am satisfied

the boat was lost some considerable time before the wreckage came ashore at Minnesota Point.

What was seen by the different boats is not out of harmony with what little is told us by the wreckage. The mate and wheelsman of the Lakeport, going to Duluth, saw some boat coming out and saw it cross the course of the Lakeport some three or four miles ahead, turn northward, and then lost the lights about a quarter after 4 in the morning of the 28th. They made an entry of that fact in the log-book, and I think the boat they saw was the Noble. The place at which they saw the boat disappear off Two Harbors would not be inconsistent with the wreckage.

We can be reasonably positive from the testimony that at 2 o'clock in the afternoon of Monday the Noble was 20 miles off Portage Canal. This was some 13 or 14 hours, at her speed, out from Duluth; so we would expect to see the steamer off Two Harbors at about this time.

Again, we have the testimony of the lighthouse keepers at Two Harbors. I feel confident that the boat they saw was the Noble coming out from toward Duluth and evidently trying to make Two Harbors. She was not approaching the harbor in such a way as the lighthouse keeper thought was safe and prudent; so he blew the fog whistle, and she evidently accepted that as wise advice because she turned out into the lake. I have no way of knowing that this was the Noble, except that she was in that locality, and all other boats have explained that they were not there.

The court is grateful to counsel for the effort exerted to advise the court of everything that occurred that night in that end of the lake, so far as can be learned from entrances, clearances, and by the testimony of witnesses from all of the ships that might be in that locality at that particular time.

I think the following is undoubtedly what occurred: That passing on her course to Superior and getting into this storm, and having passed a short distance beyond abreast of Two Harbors, the Noble decided it would be safer to enter Two Harbors and seek protection from the wind and sea at that place, rather than to continue on her course and try to enter Duluth; that she could not have gone far beyond Two Harbors, because time did not permit her to have reached the immediate vicinity of Duluth and then come back to Two Harbors; that she turned and came back near the entrance of Two Harbors, and, hearing the warning signal from Two Harbors, she turned and went out into the Lake; that, having failed in the first effort to make Two Harbors, she turned and again went down the lake towards Duluth, rather than run into the wind or in the trough of the sea; and that, having navigated in this westerly direction for a short distance, she came back again hoping to make the entrance at Two Harbors by a better approach at this time; and that she was the boat seen coming to the eastward, crossing astern of the Morrell and ahead of the Lakeport; and that then having turned to the northward again, seeking entrance at Two Harbors, she foundered and sank at the point seen by the mate and wheelsman on the Lakeport.

Again, we are assisted somewhat in reaching that conclusion by the

velocities of the wind. I am satisfied that all the witnesses on this phase of the case have tried to tell the court as best they could the velocity of the wind and the force of the sea. There is great opportunity for these witnesses to honestly differ in their estimates. The safest guide for the court in this case is the government record, interpreted in the light of the testimony of the witnesses who have observed the effect of the wind.

The contentions of the respective parties in this case are in harmony to the effect that, whatever may have been the proximate cause of the disaster, the wind and the sea had something to do with it. No one contends that if there had been no sea or wind this boat might not have gone safely across Lake Superior and into her harbor at either the Duluth or the Superior entrance. So for the purpose of trying to find when the wind became severe, we look at the records of the Weather Bureau for the velocities at Duluth, and, having in mind the testimony of the witnesses that wind is not accounted a gale until it reaches 40 miles an hour, we find the first recorded average hourly velocity of wind reaching 40 miles velocity is from 5 to 6 o'clock on the morning of April 28th. Of course, this is the velocity at Duluth, and the wind was from the northeast, so that the high velocity would have reached opposite Two Harbors, which is 22 miles to the eastward, at least half an hour earlier than at Duluth; so that, about the time the lights were seen by the Lakeport to disappear from the ship opposite Two Harbors, we find that the wind had reached this high velocity. The storm had been in the making long enough so there would be some heavy sea, and it did not depend entirely on the wind at that particular time.

The Noble was lost, ship, cargo, and crew. The owners of the Noble have filed this petition for limitation of liability, and the cargo appears here as a claimant. The Cambria Steel Company had secured insurance on the cargo from the Insurance Company of North America. I have admitted evidence in regard to that insurance, and the claim made by the cargo for the insurance. The claimant in this case is asking to recover against the owners of the ship on the theory that the ship was unseaworthy because she was overloaded. It is the contention of the owners of the Noble, the petitioners, that the Cambria Steel Company had recovered the insurance money on the theory and on the claim that the loss occurred because of the perils of the sea. I admitted the proof relative to the insurance in order that I might determine whether or not that had been done. The thing for which the owners of the vessel are liable to the cargo and the things against which the insurance company insured are different. Of course, the law would not be so unjust as to permit a claimant to come into court and recover on the theory that it was the negligence of the owners in not having a seaworthy ship, and at the same time recover from the insurance company on the ground that the loss occurred because of the perils of the sea. The two claims would be entirely inconsistent, and, in order that such a thing might not occur, I admitted that proof. It appears that no such claim has been made, and no money paid on any such claim or theory. The cargo and insurance company have protected themselves against any such situation as that, and at the same time have treated

each other with business fairness and honesty. The insurers have paid the money to the owners of the cargo under a proper arrangement and in order that their relations with their clients and customers might not be unpleasant. There is nothing in the agreement between the insurance company and the owners of the cargo in any way inconsistent with the claim here made. So having ascertained that fact, and having so found, there is nothing about the insurance which ought in any way to influence this court or affect the ultimate findings in the case.

[2] The claimants having shown that they made this contract directly with the owners of the vessel, to carry these rails, and that they were actually delivered in good order to the carrier, and that they received a bill of lading and receipt therefor, and then having proven that the cargo never reached its destination and was never delivered to the consignee, the claimant could then have rested its case, and the burden would have shifted to the petitioner in this case to prove the competency of its crew, the seaworthiness of its vessel, and that the loss occurred within one of the exceptions, such as perils of the sea, for which it is relieved of liability under the bill of lading and the so-called Harter Act (Act Cong. Feb. 13, 1893, c. 105, 27 Stat. 445 [Comp. St. 1913, §§ 8029–8035]).

The law implies on the part of every carrier, whether common or special, a warranty of seaworthiness in the absence of express agreement, and the burden of proving seaworthiness is upon the carrier.

"Such is the implied contract where the contrary does not appear." Work v. Leathers, 97 U. S. 379–380, 24 L. Ed. 1012.

See the recent case of The Fitzgerald, 212 Fed. 678, 129 C. C. A. 214 (C. C. A. Sixth Circuit, 1914), decided by the Circuit Court of Appeals of this circuit, in which the authorities upon seaworthiness and the burden resting upon the carrier are carefully discussed. See, also, Benner Line v. Pendleton et al., 217 Fed. 497, 133 C. C. A. 349 (C. C. A. Second Circuit, 1914); The Rappahannock, 184 Fed. 291, 107 C. C. A. 74; C. W. Elphicke, 122 Fed. 439, 58 C. C. A. 421; The Presque Isle (D. C.) 140 Fed. 202; Edwin 1. Morrison, 153 U. S. 199, 211, 14 Sup. Ct. 823, 38 L. Ed. 688; The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644; The Lillie Hamilton (D. C.) 18 Fed. 327; Neilson v. Coal Company, 122 Fed. 617, 60 C. C. A. 175; Sumner v. Caswell (D. C.) 20 Fed. 249.

[3-5] Seaworthiness should include the question of whether or not the vessel was overloaded. In the actual trial of the case, and in order to avoid confusion, I requested and directed the claimant to put in its full case, that then the petitioners put in their case, and that then the claimant put in its rebuttal, and that course was pursued. While the law places the burden of proving seaworthiness upon the petitioner, in a case of this kind it does not make very much difference. The court, after hearing the large number of witnesses which I have heard, will have an opinion one way or the other upon the subject, and I have a decided opinion in this case. If there was any doubt upon the question of seaworthiness, such doubt must be resolved in favor of the

shipper. See The Fitzgerald, supra. See, also, The Wildcroft, 201 U. S. 378, 389, 26 Sup. Ct. 467, 469, 50 L. Ed. 794; The Edwin I. Morrison, supra. But there can be no question of doubt in this case, as the shipper by direct and convincing evidence has proved the unseaworthiness of the carrier.

It would be impossible in this case for a court to feel positive about the depth to which the ship was loaded or ought to be loaded, if it was a question of an inch or half an inch. The issue is not such a narrow one, and I reach the conclusion and make the finding that this boat was overloaded. I will not stop with that finding, but will do the best I can to reach a conclusion as to the depth she was loaded, and as to how deep she could have been loaded without being unseaworthy. First, as to the depth to which she was loaded. She was almost "decks to." The witnesses who saw her at Conneaut, almost all, placed her down practically "decks to." While I recognize the danger of relying on witnesses who are not seafaring men, yet those men who spend their lives working there on those docks, loading these vessels day in and day out, come to have almost unconsciously a good eye for judging a proper trim and load. At the same time, I must keep in mind that they did not have any particular reason for observing it; it was not a part of their duty. If that was the only testimony in the case, I would feel some hesitancy about following it. Some saw her when she was moving out. Her movement might affect her draft. A witness might look at her and say she had eight inches of freeboard, and he might look at a place where there was more than the minimum freeboard. In other words, there is more chance for honest witnesses to put her freeboard too much, rather than the other way, although she might be listed, and make her freeboard on the lower side appear less than it actually was. One witness at Conneaut took a kodak picture of her as she was leaving the harbor, and this shows her "decks to" as nearly as I can determine. The picture is reproduced in the following cut:

The electrician and his companion at Detroit, who observed her as she was lying at the dock, did not look with any degree of accuracy. They were entirely confused about the gates and scuppers, and at the same time I think they are honest witnesses. They saw water on the deck, but that is about all I can gather from their testimony. They thought the water came in through the gates, but it is plain from their own testimony that it must have come through the scupper. I am convinced that the water came on deck while the Noble was lying at Detroit. Whether she was listed, or how high the waves were, I do not know; but it leads me to think she was loaded close down to the water's edge. Other witnesses who were casual observers at Detroit estimate her decks as being higher. Perhaps they looked at a place where the freeboard was greater than the minimum. As soon as you go further forward on the ship there would be more freeboard. The water came on, of course, only at the lowest place, while at the dock in Detroit. The government inspector was there, but he was only a casual observer so far as her draft was concerned, or so far as her cargo was concerned. I was glad to hear him say that if he had reached the conclusion that she was not seaworthy he would not have permitted her to leave the dock. He had never inspected a boat before with cargo in her, and it was not the cargo or draft of ships he was there to look after. He had not had experience in matters of that kind, and expressly said so. He was equally frank in saying he did not think he could tell when a boat was overloaded. The testimony as to her draft at Detroit is even more unsatisfactory than that at Conneaut, but it should be considered by the court along with all the rest. We next hear of her draft at the Soo, and there for the first time we have her draft taken by men who are in the business of taking drafts. The only men shown to have looked at her for the purpose of taking her draft were the government officials at the Soo.

[6] Speaking from the cases I have heard, and from such knowledge as I have regarding the loading of vessels, I have never known of a boat being loaded with an eye so solely to the amount of the cargo being put on her, as the Noble. The thing which is generally considered is the draft of the boat. The thing which the owners' agent and the master were talking about in loading the Noble was tons of cargo. What a captain usually does when he wants to know whether the ship is being overloaded, or not, is to watch her draft. If the owners want to advise a new captain, they tell him the safe draft. There are liable to be grave mistakes if anything else determines. Owners of freight, owners of vessels, and members of the crew may be anxious to carry large cargoes. By intention or mistake there may be errors as to the tonnage. The guiding thing ought to be the draft, rather than the cargo.

We come to the Soo, and there find witnesses who are employed by the government whose duty it is to watch the draft of vessels. They are experienced in doing that very work, and that is what they were looking at the Noble for, and they make a record of it for the government. We have the record showing that the Noble drew 18–3 aft. A government employé testified that her forward draft was 18–1, but

no record was made of that and there is more opportunity for mistakes on that account. While he was more competent to judge than the men who saw her at Detroit, I do not rely upon that so much as I would the government employé whose sole duty it was to record her draft, and did record her draft aft.

I have examined petitioner's records and bills of lading. Some of the loads she had carried were combination loads of pulp wood and steel rails. The computation which is submitted to me is based on the theory that a cord of pulp wood will weigh 2½ tons. I do not know how accurate that is, and I do not think I can rely on those figures. No record has been shown to me in which she ever carried a load of steel rails which weighed any more than this load.

It is called to my attention that she had one load of 2,935 gross tons of steel rails. This still falls 16 tons short of the load she had on the trip in question, and that load was carried on June 28, 1912. One load of April 19, 1911, was called to my attention, in which they compute the total tonnage as 2,916, but 2,035 tons of this was coal, and coal is measured in short tons. If I am to take short tons, then the Noble had on the trip in question 3,246 short tons, which would exceed the cargo called to my attention by 330 tons.

These bills of lading are not claimed to be accurate; sometimes the figures have been obtained from the railroad weights, and some of them are boat weights. The load in question was as heavy a load as she ever carried, if not the heaviest. All of the other loads which came anywhere near being as heavy as this one were carried during the months of June, July, and August, which are freest from storms.

Again, taking the recorded draft of this particular boat at the Soo, I find she was never recorded with a deeper draft than on this particular occasion, and never, with the exception of two other trips, was she recorded with as deep a draft as 18–3. I have before me the record of all of her trips through the Soo Locks. There is one on June 13th from South Chicago to Ft. William, showing a draft of 18–3 aft, and on June 30th from South Chicago to Ft. William a draft of 18–3 aft. All the others show a lighter draft. So, again, the records of draft at the Soo check up and coincide with the conclusion reached from the bills of lading, that she had never before carried any heavier load, and that the only occasion when she did carry loads substantially as heavy as this were during the midsummer months.

Again, to check up the matter from another source, the government makes a record in short tons of the freightage carried through the Locks, and they get this by asking the captain how many tons he has aboard. In this particular case we know with reasonable certainty how many tons this boat had on, which was 2,951 long tons, or 3,246 net or short tons. Now, examining the records of the steamer Noble for her passages at the Soo, we find that never before did she pass through the Soo Locks with a load recorded so high as 3,246 net tons. So, whether I try to check this up by the witnesses who have seen this boat and have tried to tell me how deep she was in the water, or whether I look at the kodak picture taken as she was leaving the dock at Conneaut, or whether I examine the petitioner's own record, from

their own office, as to the tonnage she has carried in years past, or whether I take the government records for the draft, or the government records for the tonnage, it all leads to the same conclusions, and helps me to feel satisfied that the result obtained is correct, viz., that she was loaded to the maximum depth she had ever been loaded, and that she was loaded almost to the "decks to" point. In order to place on the record just the best estimate I can give from the testimony, and wishing to be understood, however, that when it comes to the nicety of an inch, I am not certain, I would estimate her draft, when she left Conneaut, at 2 inches of mean freeboard or a mean draft of 17–10.

It is not sufficient simply to determine how deep she was loaded, but it is also necessary for the court to reach a conclusion as to whether or not with such a load, such a draft, such a freeboard, and such a ship, at that season of the year, she was seaworthy. Did the master and managing agent have reason to anticipate that she would meet with the gale, and that if she did the loss and damage would result? It involves a consideration of what the wind and sea were likely to be. I have in mind, not only the ship that is undertaking the voyage, but the kind and quantity of cargo, the length of the trip, the waters to be passed over, and the winds and seas likely to be experienced.

The cargo was destined for the head of Lake Superior, and this was the first trip in the year. The records show that in the past 10 years there have been 33 so-called gales (a wind of 40 miles or more per hour) at the west end of Lake Superior during the month of April. It is urged that many of these occur early in April, and before navigation is opened. The records show that the last of April has many gales. If the record had been continued into the month of May, it would have shown a good many gales occurring in May. It is the experience of men on the Lakes that the month of May furnishes some high winds on Lake Superior. This was a heavy storm. There is no question about it. Severe storms occur and are to be expected on Lake Superior at that season of the year. Some of the witnesses, it is true, have said that this was more severe than any other storm in many years; but the testimony of the men from the boats out in the sea that night leads me to think that the public records fairly show the extent of that storm and the velocity of the wind. Of course, the longer the wind blows the heavier the sea gets, if it continues from the same direction. As already found, the Noble was lost early in the storm, and the storm during the daytime on Tuesday, the 28th, had nothing to do with the disaster. I feel very certain that the witnesses who have said that this was the worst storm they had seen in many years, and who described the extent of that storm, were describing what occurred on the 28th. The picture which they have in their minds is naturally the maximum of the storm. It is what they saw when this high wind had been blowing a long time that gave them the picture and has given character to their testimony.

Two mates from boats in the storm stated that they did not call their captains (the customary practice in severe weather); that they did not change the course of their boats on account of the storm. So the conclusion which I reach with reference to the wind and sea is that,

while it was a very heavy wind and a very heavy sea, the weather reports are not in conflict with the testimony of the oral witnesses, and that such a storm was not unusual, but was to be expected in that locality at that season of the year. The Noble, her master and owners, should have anticipated all these things including velocity and direction of the wind and the resulting sea.

Now, was the Noble seaworthy when loaded down so that her decks were within two inches of the water? Upon this branch of the case, petitioner has called many witnesses, masters of experience, and the court gladly joins with counsel in what has been said about the courage and sturdy qualities of these men. I appreciate the responsibility which I am taking when I find contrary to what these men say is seaworthy. After listening to all of the testimony, I must make my own findings and reach my own conclusions. I must do it from the testimony. At the same time, we cannot help but be impressed with certain things. I think it is only fair to the record that I express myself freely. They are brave men, but they are afraid of their owners. Take the men on the ship; they are not afraid of the elements, but they are afraid of the captain. It is not the fault of the owners, and it is not the fault of the captains; but that is ship life. That rigid discipline is necessary. It has grown up with all of these years of doing things in that way. Of all the men who come into court, I think none are more brave than the sailors, and at the same time none stand in greater fear of their boss. Undoubtedly, it is a virtue rather than a fault. In any event, it is the situation. It applies as much to the relations' between the master and the managing agent (or shore captains) as it does to the orders from captain to mate. That fear, boat discipline, or whatever name it may be known by, unfortunately follows them into the courtroom, and the wishes of the boss are often more controlling than the oath. The sailor does not dare tell what occurs without permission of the captain, and the captain would not think of making a statement before communicating with the office. So long as this condition exists, it is necessary for courts to have it in mind in weighing testimony, particularly where only opinions of witnesses are to be considered. I am satisfied that this class of boats are often overloaded. I refer particularly to this class of small boats with bulwarks. The scuppers would discharge the water for washing down the decks; but, when it comes to a storm and the waves coming over the top of the bulwarks, the amount of water the scuppers could carry off is not worth figuring on, and the gates are almost as deficient even if they were open. The gates open outward, the intention being that as the wind gets fresh and the sea gets high and the boat ships water, as she rolls to the starboard side the water will rush to the starboard side of the ship, and this gate which is hung at the top will swing out and the water run out, and that, when she swings to port, the water will rush over to the port side, and the gate will swing to port and let the water run out that way. That is the theory.

This boat, as stated, was built for the canal trade, 14½-foot draft. The blueprint made of her by the man who designed her shows 14½-foot draft when loaded. There is testimony to indicate that as the

ideal draft. Any draft which puts this boat down so that she cannot discharge the water from her decks makes her dangerous and unseaworthy. If she gets out in any sea that is worthy of consideration at all (any sea that can be called a gale, like any one of these 33 gales in the month of April on the west end of Lake Superior in the last 10 years), she is going to ship water in immense quantities, and she has got to discharge it if she continues to float. It will readily be seen that as soon as you put her down with 2 inches of freeboard or even 10 inches of freeboard, that as soon as she rolls to starboard and the water tries to be discharged from the starboard side of the ship, the starboard bulwarks are down in the water, and the water holds the gates shut, and the water cannot be discharged from her decks; the same thing results when she rolls to port. So she might just as well have bulwarks without gates as with them, and the gates in my judgment are not sufficient in size to carry off the water that would be shipped on her if you were going to put her down even to the maximum amount of freeboard described by any witness in this case. If they are going to load a boat like this down anywhere near "decks to," she certainly ought not to have any bulwarks. She was built with bulwarks because she was intended to carry pulp wood with a cargo upon decks, and the pulp wood, piled many feet high on the decks, would work along with the bulwarks to keep her from shipping seas. For the draft she was intended, 14½ feet, and with the cargo she was intended, pulp wood, the bulwarks were all right and proper; but the bulwarks are not proper and of no assistance and are an absolute detriment to her when loaded with her decks near to the water. No use has been ascribed to them, and every witness who expressed himself upon that subject states that they were a detriment rather than a help. Again, not wishing to be understood as being able to be accurate, when I come to the exact figures, but in order that this record may show as accurately as I can, I fix the very least freeboard that this vessel ought to have, if she was to encounter a gale (and by that I mean 40-mile wind, and the sea that goes with it) at 18 inches of freeboard. I am not undertaking to decide what is proper freeboard for any boat or time except the one in issue, but, when a gale was reasonably to be expected, then the Noble should not have been loaded deeper than a mean draft of 16½ feet, which means a freeboard of 18 inches. So I find she was overloaded, that she encountered heavy seas and a storm, but no heavier and no greater than should have been reasonably anticipated and expected at that season of the year. The record shows that other vessels, both loaded and light, some of which were larger, some smaller, some built of wood, and some of steel, were in the vicinity of the Noble in the same storm, and came through without difficulty or damage. There is no evidence of any other vessel having suffered mishap on this occasion.

[7] I am satisfied that the captains who testified that the Noble was seaworthy have sailed their boats down where they say they have, but nearly all of them say they let them up in varying amounts in the fall of the year. Why? There is only one answer to it; that is, because of the gales and storms. Now, if they ought to expect storms in the

spring of the year, it follows that in the spring of the year these boats ought not to be loaded to their maximum, as this boat was. Moreover, the fact that other captains have been in the habit of overloading their vessels at this season, if true in fact, would not justify or relieve the owner in this case. In the case of The Fitzgerald, supra, it is said, at page 687 of 212 Fed., at page 223 of 129 C. C. A.:

"And surely it can be no defense, if true in fact, that other owners of wooden vessels were also wanting in properly protecting similar holes in the floors of their lamp rooms. It is said in The Tenedos (D. C.) 137 Fed. 443, 446, 447, affirmed 151 Fed. 1022, 82 C. C. A. 671: 'But the fact that shipowners are not in the habit of using precautions which would demonstrate unseaworthiness is immaterial. They are bound to use them'—citing The Edwin I. Morrison, 153 U. S. 199, 215, 14 Sup. Ct. 823, 38 L. Ed. 688."

Again, I am impressed with the fact that very few of the many who were called could or would say at what depth a boat becomes unseaworthy and dangerous. Counsel urge that the reason for that is because they have never loaded a boat to such a point, but know it is safe as deep as they have loaded. I am not impressed with that argument, and I think it lessens the value of their opinion to the effect that this boat was seaworthy as loaded. To tell when it is light necessitates telling when it is dark; to tell what is deep necessitates telling what is shallow; to tell what is safe necessitates telling what is unsafe. To say that a man can testify that the speed of an automobile is safe up to a certain point, but that beyond that he cannot testify what is dangerous, would not impress one with the value of the estimate placed as to safety. They qualify their ability to express an opinion in such a way that they never in any case could be witnesses for the other side and say that beyond that point it is unsafe and dangerous. I recognize the difficulty that the claimant in this case would have in getting masters to testify. In the first place, they would have to get men who were sailing boats of that kind, and I am satisfied that it would be difficult to get men who would be willing, in a case where it was simply an expression of opinion, to come into court and be witnesses against vessel owners. I think captains feel if they did that they would be jeopardizing their chances to get a boat of this class to sail the next year on the Lakes, so long as owners want their boats loaded to that depth. The record may show as my conclusion that they are sailing this class of boats down there where they have testified they do in midsummer months. No such practice has been shown for months when storms prevail. I think it is dangerous even in the summer months, and that they are unseaworthy when they are down there. They get through, if they do not get in a storm. Sometimes they get in a storm and have good luck, and then they testify that their boat is safe because it got through. Capt. Eisenhardt did not get through, and cannot be a witness on the other side in any of these lawsuits to say it is dangerous. It seems to me it should take very strong proof to satisfy a court that a boat with bulwarks can be put down in the water almost "decks to" and be safe. Even if the gates are strapped up so they are wide open, still the water would run onto the deck, and the bulwarks would hold it to a great extent and prevent it from running off as it would do if there were no bulwarks.

The same conclusion is reached from the testimony of the experts as to buoyancy. In a boat of this type the buoyancy of the poop and forecastle ought not to be taken into account. They have doors, and, if the crew want to get out and do anything on deck, they would have to open the doors.

For this type of ship, with bulwarks, we ought not to figure any buoyancy above the decks, because you cannot use that buoyancy until you get the decks under water. For safety the usual percentage of buoyancy (say 20 per cent. to 25 per cent.) ought to be found below decks, because you cannot use what is above until you get the decks down under water, and when you get the decks under water you are in trouble. If a hatch should get loose in a heavy gale, the boat would have absolutely no chance, because the men could not get back and forth on a boat like this to do anything on deck if the decks were under water. The mere fact that some get through if they do not happen to get a loose hatch, and do not part a wheel chain, and everything works fine, does not justify their captains in testifying that they were seaworthy.

[3] Now, who was to blame for the overloading? This boat was owned by a corporation, and, like all corporations, had to do business through some one representing the corporation. In this case that individual was Mr. Francombe, the managing agent of the corporation. He was a man of mature years and ripe in experience. He was, in all things pertaining to the Lakes and to the management of this boat, the corporation; he represented that corporation and handled that boat with the same authority and the same freedom that he would manage his own boat. So he stands, so far as this question is concerned, in place of the corporation, and his faults are the faults of the corporation, and binding upon the corporation. Great Lakes Towing Co. v. Mill Transportation Co. (C. C. A. Sixth Circuit, 1907) 155 Fed. 11, 83 C. C. A. 607, 22 L. R. A. (N. S.) 769; Benner Line v. Pendleton et al., supra.

In the case of Great Lakes Towing Company v. Mill Transportation Co., supra, the Court of Appeals for this circuit said:

"The contracts of the manager are the actual contracts of the owner, and are not of the same character as the contracts of the master made on a voyage or in foreign ports and which are imputed to the owner from the necessities of commerce. The acts of the managing agent within the sphere of his authority are as much the acts of the owner as if done by the owner himself. Only upon this theory could a corporation make what, for the purpose of making a distinction, is called a personal contract; that is to say one which the owner himself or itself has made."

See, also, The Loyal, 204 Fed. 930, 123 C. C. A. 252; In re Jeremiah Smith & Sons, 193 Fed. 395, 113 C. C. A. 391 (1911); The Colima (D. C.) 82 Fed. 665; Craig v. Continental Insurance Co., 141 U. S. 638, 12 Sup. Ct. 97, 35 L. Ed. 886; Parsons v. Empire Transportation Co., 111 Fed. 202, 49 C. C. A. 302; Weisshaar v. Kimball Steamship Co., 128 Fed. 397, 63 C. C. A. 139, 65 L. R. A. 84 (1904).

It is urged that it was the captain's judgment that controlled in this matter, and that he was the one who decided the cargo, and not Mr. Francombe. I cannot agree with that contention. I think that the

discretion which the captain used was no more than as to the trim of the ship; he decided whether he would stop at this particular car, or whether he would put on one more. But as to the great and important question here, as to whether this boat was loaded down almost "decks to," or whether she was loaded to 16–6, whether she had 3,000 tons, or whether it was much less than that, 2,500 or 2,600 tons, that was not left to his discretion; that was Mr. Francombe's discretion. In fact, the telegram which Capt. Eisenhardt sent Mr. Francombe shows he did not want to take all the rails. The telegram sent back to Capt. Eisenhardt did not mention the draft, and did not mention anything about safety. It did say, "Think 3,000 tons too much." I do not see how any other thought could have been entertained. A command from the owner to the captain is stronger than from the captain to the second mate, or the second mate to the deck hand. The telegram was not proper instructions. That was not directing a proper load to tell him to take all he could. That is just what the captain did; he just obeyed that command. He had never sailed in this boat before, and he had never been captain of any boat before. He had told Mr. Francombe that if he did not make good he need not pay him. Mr. Francombe told him if he did make good he would give him a bonus. He had 3,000 tons on the dock to take. Mr. Francombe wired him, "Take all you possibly can." He did take it. Then he got along up to Detroit, the managing agent went aboard of her, saw it, and talked with him about it, and the managing agent, with his experienced judgment, must have known she was overloaded, and yet he permitted her to go on her journey, thinking no doubt she would get through, and of course hoping she would get through.

It was the mistake and wrongdoing of the owners of the vessel, and they are not entitled to limit their liability, and they are responsible for the damages which resulted.

An interlocutory decree will be entered accordingly.